**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

PEG BOUAPHAKEO, JAVIER
FRAYRE, JOSE A. GARCIA, MARIO
MARTINEZ, JESUS A. MONTES, and
HERIBENTO RENTERIA,[1]

        Plaintiffs,

vs.


TYSON FOODS, INC.,



        Defendant.

No. C 07-4009-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFFS'
MOTIONS FOR CONDITIONAL
CERTIFICATION AS A
COLLECTIVE ACTION UNDER THE
FSLA AND CERTIFICATION AS A
CLASS ACTION UNDER FEDERAL
RULE OF CIVIL PROCEDURE 23**

**[TO BE FILED UNDER SEAL]**

———————————

[1] Previously, this case was captioned as "Dale Sharp, et al. v. Tyson Foods, Inc." to account for ten named plaintiffs. Six of these plaintiffs (those named in the present caption) worked at Tyson's Storm Lake, Iowa, facility. The remaining four plaintiffs (Sharp, Brian Fryar, Courtney Knutson, and Mike Sturtevant) worked at Tyson's Denison, Iowa, facility. The Denison, Iowa, plaintiffs are no longer involved in this lawsuit as a result of the parties voluntarily dismissing the claims against Tyson's Denison facility. Therefore, the court has restyled the caption to include only those named plaintiffs from Tyson's Storm Lake facility.

# TABLE OF CONTENTS

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II. FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*III. COMPATIBILITY OF FLSA AND IWPCL CLAIMS* . . . . . . . . . . . . . . 7
    *A. Preemption* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    *B. Dual Certification* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    *C. Rules Enabling Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*IV. FLSA COLLECTIVE ACTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    *A. Legal Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    *B. Legal Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        *1. First or second step?* . . . . . . . . . . . . . . . . . . . . . . . . 33
        *2. Conditional certification* . . . . . . . . . . . . . . . . . . . . . . . 36
            *a. Substantive analysis under the first step* . . . . . . . . . 37
            *b. Substantive analysis under the second step* . . . . . . . 38
                *i. Employment and factual settings of plaintiffs* . . 38
                *ii. Defenses available to Tyson* . . . . . . . . . . . . . 42
                *iii. Fairness, manageability, and procedural considerations* . . . . . . . . . . . . . . . . . . . . . 43
    *C. Conditionally Certified Collective Action Class* . . . . . . . . . . . . . . 44

*V. IWPCL CLASS ACTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    *A. Rule 23(a) Legal Standards And Analysis* . . . . . . . . . . . . . . . . . 49
        *1. Commonality* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
        *2. Typicality* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
        *3. Adequacy of representation* . . . . . . . . . . . . . . . . . . . . 53
        *4. Merged result* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    *B. Rule 23(b) Legal Standards And Analysis* . . . . . . . . . . . . . . . . . 56
        *1. Rule 23(b)(1)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        *2. Rule 23(b)(3)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    *C. Certified Class Action* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*VI. CONCLUSION AND ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Plaintiff employees request the court to allow them to proceed as representatives of a group of employees against Defendant for its allegedly illegal wage payment practices. Several issues must be addressed in considering Plaintiffs' request, but one question stands out: Does Defendant's "gang time" compensation system allow Plaintiff employees to gang up on Defendants?

## I. INTRODUCTION

Plaintiffs Dale Sharp, et al., filed a "Class Action and Representative Action Complaint" against Defendant Tyson Foods, Inc., on February 6, 2007. Dkt. # 2. Plaintiffs bring two claims against Tyson: (1) a class action under Federal Rule of Civil Procedure 23 for Tyson's alleged violations of the Iowa Wage Payment Collection Law (IWPCL), and (2) a collective action under 29 U.S.C. § 216(b) for Tyson's alleged violations under the Fair Labor Standards Act (FSLA). Plaintiffs state the court has subject matter jurisdiction over their IWPCL claim under 28 U.S.C. § 1332(d) (diversity jurisdiction for class actions), and subject matter jurisdiction over their FLSA claim under 28 U.S.C. § 1331 (federal question jurisdiction). Tyson filed its answer, raising many affirmative defenses, on March 28, 2007. Dkt. # 15.

On July 6, 2007, the court approved a scheduling order and discovery plan. Dkt. # 23. The court limited discovery to class certification issues, and set deadlines for the parties' briefs related to class action and collective action certification. On November 27, 2007, the court approved the parties' protective order to keep certain information confidential during the parties' discovery and litigation of this lawsuit. Dkt. # 29. On February 4, 2008, Plaintiffs filed a renewed sealed motion for the court to conditionally certify its FSLA claim as a collective action under the FSLA. Dkt. # 34. On the same date, Plaintiffs also filed a renewed sealed motion for the court to certify its IWPCL claim

as a class action under Rule 23. Dkt. # 35. Tyson responded with its resistance to Plaintiffs' motion for class certification on March 4, 2008, Dkt. # 45, and with its resistance to Plaintiffs' motion for conditional certification on March 5, 2008, Dkt. # 49. Plaintiffs then filed their replies on March 26, 2008. Dkt. # 59. No party has requested oral arguments on the class certification and conditional collective action certification issues. As a result, the matter is fully submitted. The trial date has not yet been set, but a telephonic status conference is set for July 9, 2008, before Chief Magistrate Judge Paul A. Zoss. Dkt. # 61.

## II. FACTUAL BACKGROUND

There were originally ten named plaintiffs in this action, but only six remain due to the dismissal of all claims involving Tyson's Denison, Iowa, facility. Dkt. # 40. The six remaining plaintiffs are current or former production employees who work or who have worked for Tyson's Storm Lake, Iowa, pork processing facility. Tyson's facility in Storm Lake receives, slaughters, and processes hogs into various cuts of pork that are then packaged and shipped to other Tyson facilities or directly to customers. The Storm Lake facility has approximately 1,600 hourly production and support employees that work on three shifts. These employees work in six main departments: the Kill, Cut, Retrim, Materials Handling/Load Out, Rendering, and Maintenance departments. Most of the hourly employees work in the Kill, Cut, and Retrim departments. None of the six remaining named plaintiffs have worked in the Rendering, Load Out, or Maintenance departments at Tyson.

All hourly production employees are required to clock in and out before and after their shift. Clocking in and out is generally only for attendance purposes. Clocking in and out only affects an employee's paid time if the employee clocks in late (in which case the

employee's pay is reduced) or comes in early or stays late to perform set up and clean up work (in which case the employee's pay is increased). The employees in the Kill, Cut, and Retrim departments are paid by "gang time,"[2] or the length of production in their department, which is generally the time it takes for hogs to travel on mechanized belts through the department. More specifically, gang time begins when the first hog or piece of pork "hits the floor" of the specific department, and gang time ends when the last hog or piece of pork "hits the floor" in that department. As a result, gang time represents the amount of work each employee performs while on the production line, and those employees at the beginning of the production line start and end a few minutes earlier than those employees at the end of the production line. The employees in the Rendering, Materials Handling/Load Out, and Maintenance departments are not paid by gang time. Instead, these employees are paid based on a pre-set start time until a pre-set end time.

In addition, most hourly employees at Tyson are given a "K code" value to compensate them for the work they perform donning and doffing their Personal Protective Equipment (PPE) before and after their shift begins. PPE is the clothing Tyson provides their employees and requires them to wear to perform their jobs. Prior to 2007, Tyson paid every employee within certain departments an extra four minutes to compensate them for the extra time they needed to don and doff their PPE. In 2007, and as a result of the United States Supreme Court decision in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005), Tyson changed its K code policy. Now, all Tyson employees are given a K code value specific

---

[2] Gang time is also sometimes called "line time," "shift time," or "mastercard time." *Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1302 (11th Cir. 2008) (mastercard time); *Salazar v. Agriprocessors, Inc.*, 527 F. Supp. 2d 873, 879 (N.D. Iowa 2007) (line time); *Saunders v. John Morrell & Co.*, No. C88-4143, 1991 WL 529542, at *7 n.2 (N.D. Iowa Dec. 24, 1991) (shift time).

to their positions to represent the extra time they need to be compensated for donning and doffing their PPE. Some are not given any K code value, but those that don and doff PPE are given a K code value somewhere between four and seven minutes.

All hourly production employees are required to wear certain PPE, but not all wear the same PPE. Employees often wear PPE such as hard hats, hairnets, beard nets (if applicable), rubber soled or steel-toed boots, hearing protection, rubber or cotton or kevlar or mesh gloves, company issued shirts and pants ("whites"), frocks, belly guards, aprons, and arm guards. In addition, most employees throughout the plant use knives, and these employees are required to wear additional clothing as added protection. Most employees who use knives are required to dip their knife and related equipment[3] in a sanitizing solution before beginning production work. Likewise, when leaving the department, the employee must perform the same sanitation procedure. In addition, at the end of their shift, these employees are required to rinse their knives and related equipment at one of several wash nozzles either in the production area or immediately outside the production area at the wash station. Employees who are required to wear a frock, "whites," hard hat, hairnet, beardnet, steel-toed boots, and earplugs must have these items on before entering the production area. All hourly employees are assigned a locker in the main locker rooms off the production hallway, which the employees use to store their required and optional clothing items and equipment. Hourly production employees receive one fifteen minute paid break and one thirty minute unpaid meal period per shift. Employees do not have to perform any washing or sanitizing during their meal period.

------

[3] Employees that use knives have scabbards to contain their knives and steels to sharpen their knives. As of April 2007, Tyson's Storm Lake facility uses no-maintenance steels that do no require sanding. [D. ex. 22].

### III. COMPATIBILITY OF FLSA AND IWPCL CLAIMS

The specific circumstances of this case must be made absolutely clear. Plaintiffs have two claims against Tyson: a federal law FLSA claim, and a state law IWPCL claim. The court has subject matter jurisdiction over the federal law claim because it is based on federal law. *See* 28 U.S.C. § 1331. The court has subject matter jurisdiction over the state law claim because the parties meet the requirements for diversity jurisdiction under the Class Action Fairness Act of 2005 (CAFA).[4] Plaintiffs ask the court to certify their federal law claim as a "collective action" under § 216(b) of the FLSA. Plaintiffs also ask the court to certify their state law claim as a "class action" under Rule 23 of the Federal Rules of Civil Procedure.

Tyson argues Plaintiffs cannot bring both the FLSA claim and the IWPCL claim in the same action because the Plaintiffs' FLSA claim preempts Plaintiffs' IWPCL claim in this case. Tyson additionally argues that Plaintiffs' IWPCL claim and request for class certification under Rule 23 should be either denied, dismissed, or limited because the class certification procedure under Rule 23 is fundamentally opposed to the collective action certification procedure under § 216(b). Tyson's arguments address the compatibility of FLSA and state law claims, and they have been the subject of many district court dockets recently. *See, e.g.*, *Ellis v. Edward D. Jones & Co, L.P.*, 527 F. Supp. 2d 439, 459 n.19 (W.D. Pa. 2007) (noting the "recent phenomenon" of the "'explosion' of hybrid lawsuits involving both state and FLSA claims"). Unfortunately, however, circuit court opinions

---

[4] CAFA gives the district court original jurisdiction over civil class actions where there are more than 100 class members, more than $5,000,000 is in controversy, any member of the class is diverse from any defendant, and the primary defendants are not governmental entities. Class Action Fairness Act of 2005 (CAFA), Pub. L. No. 109-2, § 4, 119 Stat. 4, 9 (2005) (codified at 28 U.S.C. § 1332(d)(2), (5)).

are rare on the issues confronted in these circumstances, and there is an overall paucity of decisions on the subject in the Eighth Circuit. The court is, therefore, navigating some relatively uncharted, or at least rough, waters in addressing these arguments.[5] The court will first address the issue of preemption, followed by Tyson's arguments against dual certification.

## A. Preemption

The Supremacy Clause "states that the laws of the United States made pursuant to the Constitution are the 'supreme Law of the Land.'" *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 886 (8th Cir. 2005) (quoting U.S. Const., Art. VI, cl. 2). Whether federal law preempts state law is a question of congressional intent. *Id.* ("Congressional intent is the touchstone for determining the preemptive effect of a statute." (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990))). The United States Supreme Court has identified a three-part "categorical framework" to discern whether Congress meant to preempt state law. *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1151-52 (9th Cir. 2000). According to this framework,

> [c]ourts discern an intent to preempt state law when Congress expressly forbids state regulation (express preemption), when it creates a scheme of federal regulation so pervasive that the only reasonable inference is that it meant to displace the states (field preemption), and when a law enacted by it directly conflicts with state law (conflict preemption).

_____

[5] The waters are made rougher because the cases that address the issues in this case are often unpublished. The court regrets analyzing the issues with the help of authority not recommended for publication. The court feels compelled, however, to address all the decisions in this area, whether published or not, because not many decisions exist at all.

*Wuebker*, 418 F.3d at 886 (citing *English*, 496 U.S. at 78-79). Notably, the three categories of preemption—express, field, and conflict—are not "rigidly distinct." *English*, 496 U.S. at 79 n.5.

In this case, and keeping in mind that the three categories of preemption are somewhat related, the only question is whether Plaintiffs' IWPCL claim is barred under a conflict preemption analysis. Express and field preemption do not apply because Congress did not specifically prohibit state regulation in this area. *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 n.10 (4th Cir. 2007) (addressing the similar question of whether plaintiff's state law contract, negligence, and fraud claims were preempted by the FLSA, and finding "there is no question that express preemption and field preemption are inapposite to this dispute"); *Williamson*, 208 F.3d at 1151-52 (addressing the similar question of whether plaintiff's common law fraud claim was preempted by the FLSA, and focusing on whether conflict preemption applied).[6] In fact, the FLSA contains a savings clause that allows states to enact their own laws in this area. 29 U.S.C. § 218(a). Moreover, Tyson does not specifically argue express or field preemption applies. Instead, Tyson relies almost exclusively on the recent Fourth Circuit Court of Appeals's decision in *Anderson*—which used a conflict preemption analysis—for its argument that Plaintiffs' IWPCL claim is preempted by the FLSA.

Conflict preemption, also called implied preemption, can occur in two ways: "when it is impossible for a private party to comply with both state and federal law, and when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wuebker*, 418 F.3d at 887 (quoting *Geier v. Am. Honda*

---

[6] The Fourth Circuit Court of Appeals's decision in *Anderson* in 2007, and the Ninth Circuit Court of Appeals's decision in *Williamson* in 2000, appear to be the only two recent federal appellate decisions that substantively address FLSA preemption.

*Motor Co.*, 529 U.S. 861, 873 (2000)); *see Williamson*, 208 F.3d at 1152 (noting the two types of conflict preemption). Tyson does not argue that it is impossible for Tyson to comply with both the FLSA and the IWPCL, and the court is unaware of any reason why dual compliance would not be possible. Therefore, the relevant question in this case, as it was in *Anderson* and *Williamson*, is whether the state law claim "stands as an obstacle" to Congress's objectives in the FLSA. "In determining whether state law 'stands as an obstacle' to the full implementation of a federal law, 'it is not enough to say that the ultimate goal of both federal and state law' is the same." *Forest Park II v. Hadley*, 336 F.3d 724, 733 (8th Cir. 2003) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)). State law is "preempted if it interferes with the methods by which the federal statute was designed to reach that goal." *Id.* "Thus, '[w]here a state statute conflicts with, or frustrates, federal law, the former must give way.'" *Id.* (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993)).

In *Anderson*, the Fourth Circuit Court of Appeals held that "Congress prescribed exclusive remedies in the FLSA for violations of its mandates" and, therefore, the "Class Members' FLSA-based contract, negligence, and fraud claims are precluded under a theory of obstacle preemption." 508 F.3d at 194. Most important to the court's holding was the "[c]rucial[]" fact that "the Class Members' state claims all depended on establishing that [the defendant] violated the FLSA," and that "[w]ithout doubt, these state claims essentially require the same proof as claims asserted under the FLSA itself." *Id.* at 193. The court further stated:

> The Class Members do not contend, however, that any North Carolina law entitles them to unpaid wages. Rather, as discussed above, they rely on the FLSA for their rights, and they invoke state law only as the source of remedies for the alleged FLSA violations. Importantly, the FLSA does not

> explicitly authorize states to create alternative remedies for
> FLSA violations.

*Id.* The court also noted that its holding was "consistent with the rulings of several district courts deeming state claims to be preempted by the FLSA where those claims have merely duplicated FLSA claims." *Id.* at 194 (citing *Choimbol v. Fairfield Resorts, Inc.*, No. 2:05cv463, 2006 WL 2631791, at *4-6 (E.D. Va. Sept. 11, 2006); *Moeck v. Gray Supply Corp.*, No. 03-1950, 2006 WL 42368, at *2 (D.N.J. Jan. 6, 2006); *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 292-93 (E.D.N.Y. 2005); *Morrow v. Green Tree Servicing, L.L.C.*, 360 F. Supp. 2d 1246, 1252-53 (M.D. Ala. 2005); *Sorenson v. CHT Corp.*, No. 03 C 1609(L), 2004 WL 442638, at *5-7 (N.D. Ill. Mar. 9, 2004); *Johnston v. Davis Sec., Inc.*, 217 F. Supp. 2d 1224, 1227-28 (D. Utah 2002); *Alexander v. Vesta Ins. Group, Inc.*, 147 F. Supp. 2d 1223, 1240-41 (N.D. Ala. 2001)).

The Ninth Circuit Court of Appeals came to a different conclusion in *Williamson*. In *Williamson*, the court addressed whether plaintiffs' common law fraud claims were preempted by the FLSA. 208 F.3d at 1152-54. The court stated conflict (obstacle) preemption would apply if two conditions were met: "(1) the anti-retaliation provision [in the FLSA] covers [plaintiffs' common law fraud claims] and (2) the FLSA is the exclusive remedy for claims duplicated by or equivalent of rights covered by the FLSA." *Id.* at 1152. Regarding the first condition, the court held that the FLSA anti-retaliation provision did not apply to defendant's allegedly fraudulent conduct. *Id.* In other words, plaintiffs' common law fraud claim provided the sole right and remedy for defendants' alleged bad acts. *Id.* Regarding the second condition, the court found the FLSA did not provide exclusive remedies for violating its provisions. The court initially noted that the FLSA's savings clause at 29 U.S.C. § 218(a), which allows states to enact stricter wage, hour, and child labor provisions, "indicates that [the FLSA] does not provide an exclusive remedy."

*Williamson*, 208 F.3d at 1151. Then the court distinguished a pair of cases, *Kendall v. City of Chesapeake*, 174 F.3d 437 (4th Cir. 1999), and *Lerwill v. Inflight Motion Pictures*, 343 F. Supp. 1027 (N.D. Cal. 1972), to at least raise doubt that the FLSA provides the exclusive remedy for violating its provisions.[7] Both of these cases suggested or stated that the FLSA contained the exclusive remedies for its own violations. *Kendall*, 174 F.3d at 443 ("[I]n the FLSA Congress manifested a desire to exclusively define the private remedies available to redress violations of statute's terms."); *Lerwill*, 343 F. Supp. at 1029 ("The only conclusion possible, then, is that the statutory remedy is the sole remedy available to the employee for enforcement of whatever rights he may have under the FLSA."). Regarding *Kendall*, the *Williamson* court noted that *Kendall* was not a case about preemption, but about "whether another federal statute (Section 1983) can support a claim that clearly falls under the FLSA." *Williamson*, 208 F.3d at 1153. Regarding *Lerwill*, the Ninth Circuit Court of Appeals noted it was also "dubious authority" because it did not discuss preemption at all, and because "[i]t was about a plaintiff's effort to get a more favorable remedy." *Id.* Thus, in the end, the court found neither of its obstacle preemption conditions satisfied, and therefore held that the FLSA did not preempt plaintiffs' common law fraud claim. *Id.*

Whether this court should ultimately follow the persuasive authority in *Anderson* or *Williamson*—there is no mandatory authority on point—requires the court to review the applicable state law in this case, the IWPCL, in light of the arguments made for and

---

[7] Interestingly, the *Anderson* court relied on *Kendall* for its holding that the FLSA provided the exclusive remedy for FLSA violations. *Anderson*, 508 F.3d at 194 ("Whether the FLSA provides exclusive remedies for the enforcement of its own provisions is a question that need not occupy us for long, because we already answered it [affirmatively] in *Kendall*.").

against preemption. The IWPCL is a "remedial statute," and "meant to facilitate the public policy of allowing employees to collect wages owed to them by their employers." *Hornby v. State*, 559 N.W.2d 23, 26 (Iowa 1997). Section 91A.3 gives employees the right to receive their wages. It states, "An employer shall pay all wages due its employees. . . ." Iowa Code § 91A.3. The IWPCL also gives employees the right to receive their "wages due" in "at least monthly, semimonthly, or biweekly installments on regular paydays," *id.*, and provides suspended or terminated employees with the right to receive their "wages earned" by "the next regular payday," *id.* § 91A.4. The FLSA, of course, provides similar rights, like the rights to a minimum wage and overtime pay. 29 U.S.C. §§ 206, 207. A big difference between the FLSA and IWPCL is that the IWPCL is more concerned with when or how wages are paid. *See Runyon v. Kubota Tractor Corp.*, 653 N.W.2d 582, 585 (Iowa 2002) ("We have observed that the purpose of chapter 91A is to 'facilitate collection of wages by employees.'" (quoting *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 593 (Iowa 1993))). Nevertheless, both statutes require employers to pay certain wages to their employees. *See Stahl v. Big Lots Stores, Inc.*, No. 06-CV-1026-LRR, 2007 WL 3376707, at *5 (N.D. Iowa Nov. 7, 2007) ("The purpose of the FLSA and the IWPCL is to 'facilitate the collection of wages owed to employees.'" (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 201 (Iowa 1997))). While the FLSA prescribes exactly what kind of wages must be paid, *see* 29 U.S.C. §§ 206, 207, the IWPCL simply requires that an employer "pay all wages due its employees," Iowa Code § 91A.3. Thus, the FLSA may be used to establish an employee's right to a certain amount of wages under the IWPCL and an employer's violation of the IWPCL for not paying "all wages due its employees." *Id.*

And that appears to be exactly the case here. Plaintiffs complaint alleges that Tyson is obligated to pay all wages to its employees under the IWPCL, but Plaintiffs never state

what law or right—other than those rights conferred by the FLSA—they rely on that establishes they are entitled to the wages they seek. In addition, despite Tyson's argument that Plaintiffs' IWPCL claim is based on a violation of the FLSA,[8] Plaintiffs do not assert their right to wages due under the IWPCL is conferred by anything other than the FLSA. In such a case, it is perhaps obvious that Plaintiffs rely on the FLSA to establish a violation under the IWPCL for Tyson's failure to "pay all wages due its employees." *Id.* This is not surprising, as this court has recognized this situation before: The "violation of the FLSA is precisely the basis for the wages purportedly owed under the IWPCL in this case. Thus, the IWPCL claim is essentially 'duplicative' of the FLSA claim in this action." *Bartelson v. Winnebago Indust., Inc.*, 219 F.R.D. 629, 634 (N.D. Iowa 2003) (citations omitted).[9]

---

[8] Tyson specifically argues that "the IWPCL does not provide Plaintiffs with any substantive rights, but simply provides a mechanism for plaintiffs to recover wages owed but unpaid," and that "Plaintiffs' claims under the IWPCL must rely on the FLSA to establish the underlying right to compensation allegedly owed by defendant within the meaning of the IWPCL." Dkt. # 45.

[9] A violation of the IWPCL, however, is not always dependent upon establishing a violation of the FLSA. The specific amount of "wages due" to employees under the IWPCL must be provided by something other than the IWPCL. And as a general matter, that amount does not have to be provided by the FLSA. The wages due under the IWPCL could be based on any number of legal bases, such as an employment agreement or Iowa's minimum wage law. *See* Iowa Code § 91D.1 (requiring a minimum wage of "$7.25 as of January 1, 2008"). Because the IWPCL may rely on a legal basis for wages that is stricter or different than the FLSA, the IWPCL is not generally duplicative of the FLSA. *Cf. Avery v. City of Talladega*, 24 F.3d 1337, 1348 (11th Cir. 1994) ("[T]he district court erred in holding that the FLSA pre-empts a state law contractual claim that seeks to recover wages for time that is compensable under the contract though not under the FLSA."). Moreover, the IWPCL could apply in different circumstances than the FLSA, because the FLSA covers employers and employees who are not necessarily covered under

(continued...)

As a result, this case appears similar to the case in *Anderson*. Plaintiff's state law claims in *Anderson* depended on violations of the FLSA, as they do here. 508 F.3d at 193-94. In *Williamson*, however, the plaintiff's common law fraud claim did not depend on any violation of the FLSA—the FLSA did not even provide a basis for recovery for the claim asserted by the plaintiff. 208 F.3d at 1152-53. Nevertheless, the court does not believe such "duplication" means Plaintiffs' IWPCL claim is preempted by their FLSA claim because the court, like the court in *Williamson*, does not believe the FLSA provides the exclusive remedy for its violations. Thus, the court disagrees with the Fourth Circuit Court of Appeals's determination that the FLSA provides otherwise. *Anderson*, 508 F.3d at 194; *see Roman v. Maietta Const., Inc.*, 147 F.3d 71, 76 (1st Cir. 1998) ("As the trial court noted, 'the FLSA is the exclusive remedy for enforcement of rights created under the FLSA.'"). As the court in *Williamson* determined, "the 'savings clause' indicates that [the FLSA] does not provide an exclusive remedy." 208 F.3d at 1151. The savings clause provides:

> No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum work week lower than the maximum work week established under this chapter . . . .

29 U.S.C. § 218(a). Under the savings clause, a state may clearly provide greater benefits, or rights, than the FLSA. While the savings clause does not specifically reference remedies, the court believes the savings clause indicates that Congress did not

---

[9](...continued)
the IWPCL. *See Dietrich v. Liberty Square, L.L.C.*, No. C 05-2037-EJM, 2006 WL 1876989, at *1-2 (N.D. Iowa July 6, 2006) (finding that the definitions of employer and employee are different under the FLSA and IWPCL).

foreclose states from providing alternative remedies. In addition, while the *Anderson* court focused on the fact that the FLSA does not "explicitly authorize states to create alternative remedies for FLSA violations," 508 F.3d at 193, neither does the FLSA explicitly forbid states from doing so. In light of the savings clause, the court thinks the better conclusion is that the FLSA does not provide the exclusive remedy for violations of its mandates.[10]

Moreover, because the FLSA does not provide the exclusive remedy for its violations, the court does not believe Plaintiffs' duplicative IWPCL claim "interferes," "frustrates," "conflicts," or "stands as an obstacle" to the goals of the FLSA. *Forest Park II*, 336 F.3d at 733 (quotations omitted). It may be true that Plaintiffs' IWPCL claim depends on proving an FLSA violation to succeed. But the court does not see how this dependency or duplication means, under an implied/conflict/obstacle preemption analysis, that Plaintiffs' IWPCL claim is preempted by the FLSA. The goal of the FLSA—"to

---

[10] In this case, the remedies available under the IWPCL are almost identical to the remedies available under the FLSA. *See Stahl v. Big Lots Stores, Inc.*, No. 06-CV-1026-LRR, 2007 WL 3376707 (N.D. Iowa Nov. 7, 2007) (comparing the remedies available under the IWPCL and the FLSA). Under the IWPCL, successful plaintiffs may recover "unpaid wages or expenses, court costs and usual and necessary attorney's fees incurred in recovering the unpaid wages or expenses." Iowa Code § 91A.8. In addition, the successful plaintiff under the IWPCL may recover liquidated damages, generally limited to "the amount of unpaid wages," *id.* § 91A.2(6), "[w]hen it has been shown that an employer has intentionally failed to pay an employee wages or reimburse expenses pursuant to section 91A.3," *id.* § 91A.8. Under the FLSA, successful plaintiffs may recover "their unpaid minimum wages, or their unpaid overtime compensation . . . and . . . an additional equal amount as liquidated damages." 29 U.S.C. § 216(b); *see id.* (noting also that violations of section 215(a)(3) entitle the employee to equitable relief, including "employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages."). In addition, the successful plaintiff under the FLSA may recover a "reasonable attorney's fee to be paid by the defendant, and costs of the action." *Id.*

eliminate 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers,*" *Anderson*, 508 F.3d at 192 (quoting 29 U.S.C. § 202(a))—is not frustrated by enforcing the IWPCL, *see Forest Park II*, 336 F.3d at 733 (noting a state statute must give way when it frustrates federal law).  And the court does not see how enforcement of the IWPCL "interferes with the methods by which the federal statute was designed to reach that goal." *Id.* (quotation omitted).  Tyson certainly argues the "method" of FLSA collective action certification is interfered with by the Rule 23 class action procedure for Plaintiffs' IWPCL claim, but the IWPCL itself does not interfere with the methods by which the FLSA is implemented.[11] The IWPCL does not interfere with or stand as an obstacle to the FLSA, despite the fact that Plaintiffs' IWPCL claim is duplicative of their FLSA claim.  *See Takacs v. A.G. Edwards & Sons, Inc.*, 444 F. Supp. 2d 1100, 1117 (S.D. Cal. 2006) ("Here, as in *Williamson*, Plaintiffs' fraud claims under [California's Unfair Competition Law] would not contradict any purpose or application of the FLSA, and therefore should stand.").

Of course, the court is aware of the plethora of cases holding that the FLSA preempts duplicative state law claims.  *See Anderson*, 508 F.3d at 194 (citing cases); *Woodard v. FedEx Freight East, Inc.*, 2008 WL 471552, at *11, __ F.R.D. __, __ (M.D. Pa. Feb. 19, 2008) ("[A] conflict exists where, as here, the state wage law claim parallels the FLSA action."); *Lopez v. Flight Servs. & Sys., Inc.*, No. 07-CV-6186 CJS, 2008 WL 203028, at *5, 7 (W.D.N.Y. Jan. 23, 2008) (holding that "Plaintiffs' state common-law claims for fraud, breach of contract, breach of implied covenants of good faith, tortious interference with contract, and unjust enrichment are preempted by the FLSA" because

---

[11] This argument, in fact, is not advanced by Tyson as a reason for preemption, but as a reason for denying, dismissing, or limiting Plaintiffs' request for Rule 23 class certification.

they are duplicative of the FLSA); *Nimmons v. RBC Ins. Holdings (USA), Inc.*, No. 6:07-cv-2637, 2007 WL 4571179, at *2 (D.S.C. Dec. 27, 2007) ("The foregoing authorities compel the conclusion that Plaintiff's state law claims are not viable and should be dismissed as duplicative of the rights and remedies available under the FLSA."); *see also Ellis*, 527 F. Supp. 2d at 449 (using a preemption analysis to "assess[] the opt-in/opt-out conflict," and although not deciding whether the FLSA preempted plaintiff's state law claims, suggesting it would reach such a conclusion).   In fact, nearly every court to consider the issue recognizes that state law claims that merely duplicate or depend on the FLSA are preempted by federal law.   *See Lopez*, 2008 WL 203028, at *5 ("Moreover, almost without exception, the District Courts that have considered the question [of whether a duplicative state law claim is preempted by the FLSA] have reached the same result [as the Fourth Circuit Court of Appeals in *Anderson*]." (citing *Choimbol*, 2006 WL 2631791, at *5, and *Petras v. Johnson*, No. 92 CIV. 8298(CSH), 1993 WL 228014, at *2, 3 (S.D.N.Y. June 22, 1993))).   But there are also plenty of cases holding the FLSA does not *generally* preempt state law claims in a given case.   *See Guzman v. VLM, Inc.*, No. 07-CV-1126 (JG)(RER), 2008 WL 597186, at *10 (E.D.N.Y. March 2, 2008) ("[I]t is settled in the Second Circuit that FLSA does not preempt state wage and hour laws."); *Thorpe v. Abbott Labs., Inc.*, 534 F. Supp. 2d 1120, 1124 (N.D. Cal. 2008) ("[T]he FLSA clearly indicates that it does not preempt stricter state law claims." (citing 29 U.S.C. § 218(a))); *Sjoblom v. Charter Commc'ns, L.L.C.*, No. 3:07-cv-0451-bbc, 2007 WL 4560541, at *5 (W.D. Wis. Dec. 19, 2007) ("[T]he [FLSA] does not preempt Wisconsin wage and hour laws."); *Neary v. Metro. Prop. & Cas. Ins. Co.*, 472 F. Supp. 247, 251 (D. Conn. 2007) ("[T]he FLSA does not preempt state wage and hour statutes."); *Takacs*, 444 F. Supp. 2d at 1116-18 ("The Ninth Circuit has held that the FLSA does not preempt state law overtime wage laws. . . ."); *Dancer I-VII v. Golden Coin, Ltd.*, 176 P.3d 271, 273

(Nev. 2008) (per curiam) ("Given that the FLSA expressly provides that higher state minimum wage legislation may control minimum wage claims, and because Nevada's minimum wage law provides greater employee wage protection than that provided under the FLSA, we conclude that the FLSA does not preempt the NWHL."). Although this case may be a first in holding that the FLSA does not preempt a *duplicative* state law claim, the court believes the better conclusion in this case—where there is no controlling authority on the subject and the court believes the FLSA does not provide the exclusive remedy for its violations—is that the FLSA does not preempt Plaintiffs' duplicative IWPCL claim.[12]

## B. Dual Certification

Tyson's second argument against Plaintiffs' IWPCL claim is that the procedural aspects of class certification under Federal Rule of Civil Procedure 23 are so completely at odds with the procedural aspects of collective action certification under 29 U.S.C. § 216(b), that Plaintiffs' IWPCL claim must be denied, dismissed, or limited. Tyson's

---

[12] *Osby v. Citigroup, Inc.*, No. 07-cv-06085-NKL, 2008 WL 2074102 (W.D. Mo. May 14, 2008), is the only authority the court can find from the Eighth Circuit that directly tackles the preemption issue. In *Osby*, the district court determined plaintiff's state law claim of unjust enrichment was not preempted by the FLSA because the state law claim did "not depend on establishing that Citigroup violated the FLSA." 2008 WL 2074102, at *2. While the court's holding here is inconsistent with *Osby*—because the state law claim in this case depends on establishing that Tyson violated the FLSA—the court's holding regarding preemption in this case is, as Plaintiffs point out, at least consistent with the *results* of two prior cases in this district that allowed IWPCL and FLSA claims to proceed together, although the question of preemption never arose. *See Salazar v. Agriprocessors, Inc.*, 527 F. Supp. 2d 873, 884-85 (N.D. Iowa 2007) (exercising supplemental jurisdiction over plaintiff's IWPCL claim); *Bartelson*, 219 F.R.D. at 634 (same).

argument focuses on the differences between the "opt-out" procedure under Rule 23 and the "opt-in" procedure under § 216(b). This argument, like Tyson's preemption argument, is particularly popular among district court dockets right now. *See, e.g.*, *Woodard*, 2008 WL 471552, at *6-12. No clear or consistent resolution appears imminent, however,[13] and like the question of preemption, there is no controlling authority for the court to rely on.

Despite their confusing semantic similarities, the differences between class actions and collective actions are great. *See Lugo v. Farmer's Pride Inc.*, 2008 WL 638237, at *2 (E.D. Pa. March 7, 2008) ("Class actions and collective actions can often be confused with each other."); *Salazar*, 527 F. Supp. 2d at 877 ("At the outset, it is crucial to note the distinction between a FLSA *collective* action and a Rule 23 *class* action. The distinction is sometimes blurred."). *See generally* Wright, Miller, & Kane, *Federal Practice and Procedure* § 1807 at 468-77 (2005 & Supp. 2007) [hereinafter Wright] (stating the differences between Rule 23 class actions and FLSA collective actions). Plaintiffs in class actions certified under Rule 23 are generally a member of the class unless they opt-out.[14] *See In re Piper Funds, Inc.*, 71 F.3d 298, 303-04 (8th Cir. 1995)

---

[13] The different results obtained in these cases are evident from two recent decisions that were announced on the same day, but with opposite results. *Compare Ellis*, 527 F. Supp. 2d at 449-52 (holding the opt-in and opt-out procedures created a conflict that required "Plaintiffs parallel state claims [to] be dismissed"), *with Freeman v. Hoffmann-Laroche, Inc.*, No. 07-1503 (JLL), 2007 WL 4440875, at *2 (D.N.J. Dec. 18, 2007) (denying Defendants' motion "to dismiss or strike Plaintiffs' state law class action allegations solely on the basis of their 'inherent incompatibility' with the asserted FLSA collective action").

[14] Not all class actions under Rule 23 are the same:

Rule 23(b) authorizes three types of class actions and makes

(continued...)

(recognizing plaintiffs have a right to opt out of a Rule 23 class action). Under § 216(b), plaintiffs must opt-in to become a member of the collective action. 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

There is no doubt that the opt-in/opt-out distinction represents "a fundamental, irreconcilable difference between the class action described by Rule 23 and that provided for by [the] FLSA." *Schmidt v. Fuller Brush Co.*, 527 F.2d 532, 536 (8th Cir. 1975); *see Woodard*, 2008 WL 471552, at *9 ("Rule 23 is the antithesis of § 216(b)."). Because of this difference many courts have held that Rule 23 class actions may not be maintained in the same action as a FLSA collective action. *See Burkhart-Deal v. Citifinancial, Inc.*, 2008 WL 2357735, at *1-2 (W.D. Pa. June 5, 2008) (concluding "the inherent incompatibility Plaintiff's FLSA claims and state law class claims, in this particular case, require dismissal of the state law class claims"); *Woodard*, 2008 WL 471552, at *12 (dismissing Plaintiffs' Rule 23 class allegations because "the Court finds that simultaneous prosecution of Mr. Woodard's FLSA collective action and [Pennsylvania Minimum Wage Act claim] class action will frustrate the congressional intent and circumvent § 216(b)'s opt-in requirement"); *Ellis*, 527 F. Supp. 2d at 452 (dismissing plaintiffs' parallel state

---

[14](...continued)
> participation in the first two types mandatory for individuals falling within the definition of the class. The third type of class action under Rule 23(b)(3) requires individuals falling within the definition of the class to opt out of the litigation if they do not wish to be bound by any judgment that is reached.

Wright, § 1807 at 474. In this case, Plaintiffs request class certification under Rule 23(b)(1) and (3).

law claims because "the policies that underlie the FLSA" would be "total[ly] negat[ed] . . . if the Court were to allow Plaintiffs to pursue state law overtime remedies under Rule 23 and FLSA opt-in remedies in the same action"). Still many other courts, however, have allowed both class and collective actions to proceed. *See Osby*, 2008 WL 2074102, at *3 ("District court cases permitting FLSA collective actions to proceed simultaneously with Rule 23 state actions are legion."); *Jackson v. Alpharma Inc.*, 2008 WL 508664, at *4-5 (D.N.J. Feb. 21, 2008) (addressing the incompatibility argument, and concluding "that it is premature to dismiss Plaintiff's state law claims, given that Plaintiff has alleged this Court has independent CAFA jurisdiction over the claims"). In fact, in this district, the court has recognized that "[o]ther district courts have proceeded well beyond the stage of exercising supplemental jurisdiction and have certified both FLSA collective actions and Rule 23 classes involving claims of violations of state wage payment collection laws." *Salazar*, 527 F. Supp. 2d at 884-86 (choosing to exercise, at the time, its supplemental jurisdiction to entertain plaintiffs' IWPCL claim and FLSA claim together). Of course, in this case, there is no question of supplemental jurisdiction: Plaintiffs' state law claim under the IWPCL has an independent jurisdictional basis under 28 U.S.C. § 1332(d), or CAFA. The only question now is whether the differences between Rule 23 class action certification and collective action certification under the FLSA require the court to deny, dismiss, or limit Plaintiffs' IWPCL claim and request for class certification.

Although the court is cognizant of the procedural differences between a Rule 23 class action and FLSA collective action, as well as the unique challenges created when such actions are maintained in the same suit, the court does not feel these differences and challenges are a reason to deny, dismiss, or limit Plaintiffs' class action claim, especially when such a claim has an independent jurisdictional basis. Plaintiffs, of course, must still meet the requirements for collective action and class action certification. If they do, the

court will then take up the challenges inherent in maintaining both actions in one suit. The inherent challenges, however, are not a basis to deny, dismiss, or limit Plaintiffs' state law claim. *See Salazar*, 527 F. Supp. 2d at 886 ("The court is well-equipped to manage a case involving a FLSA collective action and a state-law class action."); *Guzman*, 2008 WL 597186, at *9 ("It is true that there would be some possibility of confusion, but this can be allayed through careful wording of the class notice."). After all, Plaintiffs would still be under the same opt-in/opt-out predicament even if Plaintiffs brought their IWPCL suit in another court or action.[15] Addressing this situation, another district court opined:

> Plaintiff's state law class action claims could proceed separately from the federal action in this court pursuant to the Class Action Fairness Act. Although including the federal and state law claims in the same lawsuit will pose challenges, I am not persuaded that separate adjudication of these claims will reduce confusion among potential class members who would still receive two notices concerning almost identical facts: one requiring them to opt in to a federal collective action and another including them in a state law class action unless they opt out. Clearly drafted collective and class action notices should help alleviate confusion in this case.

*Sjoblom*, 2007 WL 450541, at *5 (citation omitted).

Tyson also argues the court should not allow both actions to proceed because doing so would have serious legal ramifications for potential plaintiffs who did not opt-in to the FLSA action. In other words, if class members under Rule 23 failed to opt-in to the FLSA

---

[15] It should be noted, however, that Plaintiffs have asked for class action certification under both subdivision (b)(1) and (b)(3) of Rule 23. If the court were to certify Plaintiffs' class action under (b)(1), Plaintiffs would not be able to opt-out of the class action because membership is mandatory under either (b)(1) or (b)(2). *See generally* Wright, § 1784.1 at 343-344. Only if the court were to certify Plaintiffs' class action under subdivision (b)(3) would there truly be an opt-in/opt-out situation.

collective action, they might subsequently be precluded by principles of res judicata from asserting their federal rights under the FLSA. The court knows of no case that has so held, and the court does not believe this is a serious or valid concern, *see Guzman*, 2008 WL 597186, at *10 n.11 (rejecting this argument), or that Tyson genuinely shares this concern. Finally, Tyson argues that the court should exercise its discretion and limit the number of class members under Rule 23 to only those that opt-in under the FLSA. This court has done so when addressing concerns of supplemental jurisdiction, *see Bartelson*, 219 F.R.D. at 634-38 (holding that the court's supplemental jurisdiction over plaintiffs' state law claims extended only to those state law class members who also opted in to the FLSA claim), *but see Lindsay v. Gov't Employees Ins. Co.*, 448 F.3d 416, 420-425 (holding the opt-in provision of the FLSA did not expressly prohibit the exercise of supplemental jurisdiction over those state law claimants that did not opt-in), but Plaintiffs IWPCL claims have an independent jurisdictional basis in this case under CAFA. Furthermore, because the court does not find the differences between a class action and a collective action preclude the maintenance of both actions, the court does not believe it is necessary to limit the class action in the manner suggested.

### C. Rules Enabling Act

Some of the decisions confronting the issues in this case address an argument against dual certification based on the Rules Enabling Act (REA), 28 U.S.C. § 2072(a). *E.g.*, *Damassia v. Duane Reade, Inc.*, 2008 WL 2201469, at *12, ___ F.R.D. ___, ___ (S.D.N.Y. 2008). Such an argument has not been advanced in this case. Thus, the court expresses no opinion on the subject other than to note that there is no controlling authority, and that courts have come to differing conclusions. *Compare Ellis*, 527 F. Supp. 2d at 454 (finding, in the alternative under the REA, that plaintiffs duplicative state law claims

should be dismissed), *with Osby*, 2008 WL 2074102, at *3-4 (rejecting defendant's argument under the REA); *Sjoblom*, 2007 WL 4560541, at *5 (same); *Freeman*, 2007 WL 4440875, at *3 (same).[16]

## IV.  FLSA COLLECTIVE ACTION

Plaintiffs seek *conditional* certification of their FLSA claim as a collective action pursuant to 29 U.S.C. § 216(b).  Plaintiffs request the court to authorize notice to all potential collective action class members.  Tyson resists the Plaintiffs' request.

### A.  Legal Standards

"An employee may bring an FLSA action on behalf of himself and any other 'similarly situated' employees." *Salazar v. Agriprocessors, Inc.* (*Salazar II*), No. 07-CV-1006-LRR, 2008 WL 782803, at *3 (N.D. Iowa March 17, 2008) (quoting 29 U.S.C. § 216(b)).  Specifically, the FLSA provides:

---

[16] *Ellis* and *Freeman* were announced on December 18, 2007, and *Sjoblom* was announced on December 19, 2007.  In *Sjoblom*, the court stated that "the only courts that have addressed the argument that the Rules Enabling Act prevents simultaneous litigation of state and federal class labor claims have squarely rejected it." 2007 WL 4560541, at *5.  Since the *Sjoblom* decision was announced a day after *Ellis*, it is not surprising that *Sjoblom* failed to discuss the contrary authority in *Ellis*.  However, it appears the court in *Osby* made the same mistake much later, when it was announced on May 14, 2008.  *See Osby*, 2008 WL 2074102, at *4 (noting all courts that have addressed the REA argument have rejected it).  Contrary to the indications in *Osby* and *Sjoblom*, there is at least one case—*Ellis*—that has found favorably for the defendants on the basis of an REA argument.  *See also Damassia*, 2008 WL 2201469, at *12, __ F.R.D. at __ (addressing and disagreeing with the *Ellis* decision, and noting "[Defendant] relies on a single district court decision from another circuit for the proposition that the Rules Enabling Act prevents the certification of a class for state wage claims related to FLSA wage claims.").

> An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). Thus, the FLSA "allows as class members only those who 'opt in.'" *Schmidt v. Fuller Brush Co.*, 527 F.2d 532, 536 (8th Cir. 1975). The FLSA provides the district court with "the requisite procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure." *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). The court has a "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation" of potential opt-in plaintiffs, *Severston v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991), but the district court should, "in appropriate cases," exercise its discretion to facilitate notice to potential plaintiffs, *Hoffman-La Roche Inc.*, 493 U.S. at 169.

Section 216(b) does not define when "other employees [are] similarly situated" so that collective action certification, and the authorization of notice, is appropriate. 29 U.S.C. § 216(b). Similarly, the Eighth Circuit Court of Appeals has not defined what "similarly situated" means, or elaborated on when it is an "appropriate case[]" to facilitate notice. *Salazar II*, 2008 WL 782803, at *3. Courts across the country, however, have discussed various approaches to determine whether plaintiffs are similarly situated.[17] The

---

[17] The Tenth Circuit Court of Appeals explained three different approaches to
(continued...)

great majority of these courts—including most or all of the district courts within the Eighth Circuit—have championed a two-step approach to determine collective action certification under § 216(b). *See Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006) (recognizing that the two step approach is "typically used by courts in suits filed under 29 U.S.C. § 216(b)"); *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) ("The two-tiered approach to certification of § 216(b) opt-in classes . . . appears to be an effective tool for district courts to use in managing these often complex cases, and we suggest that district courts in this circuit adopt it in future cases."); *Resendiz-Ramirez v. P & H Forestry, L.L.C.*, 515 F. Supp. 2d 937, 940 (W.D. Ark. 2007) ("The Eighth Circuit has not yet declared which approach it favors in deciding whether plaintiffs are similarly situated under 29 U.S.C. § 216(b), but the district courts in this circuit use the two-stage analysis.").

Because the Northern District of Iowa has artfully danced the "two-step" before, *see, e.g.*, *Salazar II*, 2008 WL 782803 at * 3-4, and other circuit courts approve the use of this approach, *see, e.g.*, *Thiessen*, 267 F.3d at 1105 (noting "there is little difference in the various approaches," but that the two-step approach is "[a]rguably . . . the best of the three"), and because neither party in this case has advanced an argument to apply a different approach,[18] the court will follow the two-step approach to determine whether

---

[17](...continued)
collective action certification under § 216(b): (1) a two-step, or "*ad hoc* case-by-case" approach, (2) an approach incorporating the analysis used for class certification under Federal Rule of Civil Procedure 23, and (3) an approach incorporating the analysis used for "spurious" class actions under pre-1966 Rule 23. *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102-03 (10th Cir. 2001).

[18] However, the parties dispute whether the court should employ a first step or
(continued...)

other employees are similarly situated for collective action certification under § 216(b), *see Resendiz-Ramirez*, 515 F. Supp. 2d at 941 ("The Court is convinced that the more prudent approach is to use the two-stage certification analysis that is used by a majority of courts, including a majority of district courts in the Eighth Circuit."). Nevertheless, the court believes the admonition by the Eleventh Circuit Court of Appeals is important: "Nothing in our circuit precedent, however, requires district courts to utilize this approach. The decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court." *Hipp*, 252 F.3d at 1219.

The two-step approach to collective action certification "'distinguishes between conditional class certification, generally made at the "notice stage," and a final class certification determination made after discovery is largely completed.'" *Dietrich*, 230 F.R.D. at 577 (quoting *Campbell*, 2001 WL 34152094, at *2).

> Applying the two-part test, the Court first uses a lenient standard to determine whether similarly situated persons exist, and if appropriate, the class is conditionally certified. The second step occurs after notice, time for opting-in, and discovery have taken place. Applying a stricter standard, the Court makes a factual determination on the similarly situated question. The second inquiry is usually conducted upon a defendant's motion for decertification.

*Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 944 (W.D. Ark. 2003) (citation omitted); *see Resendiz-Ramirez*, 515 F. Supp. 2d at 940-41 (explaining the two-step approach). Whether during the first step/notice stage or second step/final stage, the burden remains on the plaintiffs to show that "other employees [are] similarly situated." 29

---

[18](...continued)
second step analysis at this point in the parties' litigation.

U.S.C. § 216(b); *see Frank v. Gold'n Plump Poultry, Inc.*, No. 04-CV-1018 (PJS/RLE), 2007 WL 2780504, at *2-3 (D. Minn. Sept. 24, 2007) (recognizing the plaintiffs' burdens at the first and second steps).

At the first step, or notice stage, "[t]o show conditional certification is warranted, the plaintiffs 'need merely provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist.'" *Salazar II*, 2008 WL 782803 at *5 (quoting *Dietrich v. Liberty Square, L.L.C.*, 230 F.R.D. 574, 577 (N.D. Iowa 2005)). Although the burden at the first step is "more lenient," and does not require existing plaintiffs to "show that members of the conditionally certified class are actually similarly situated," *Fast v. Applebee's Int'l, Inc.*, 243 F.R.D. 360, 363 (W.D. Mo. 2007), "plaintiffs must present more than mere allegations; i.e., some evidence to support the allegations is required," *Young v. Cerner Corp.*, 503 F. Supp. 2d 1226, 1229 (W.D. Mo. 2007). The supporting evidence should include "evidence that other similarly situated individuals desire to opt in to the litigation" because "'[o]thers' interest in joining the litigation is relevant to whether or not to put a defendant employer to the expense and effort of notice to a conditionally certified class of claimants.'" *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1164-65 (D. Minn. 2007) (quoting *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *9 (S.D. Tex. Jan. 24, 2007)). In addition to "whether potential plaintiffs have been identified," district courts outside of the Eighth Circuit have evaluated several other factors at this stage to determine the propriety of conditional certification, including "whether affidavits of potential plaintiffs have been submitted, whether there is evidence of a widespread discriminatory plan, and whether, as a matter of sound management, a manageable class exists." *Jimenez v. Lakeside Pic-N-Pac, L.L.C.*, 2007 WL 4454295, at *2 (W.D. Mich. Dec. 14, 2007) (citing *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004)). In sum, "[c]onditional

certification in the first step 'requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan.'" *Young*, 503 F. Supp. 2d at 1229 (quoting *Davis v. NovaStar Mortg., Inc.*, 408 F. Supp. 2d 811, 815 (W.D. Mo. 2005)).

At the second step, or final stage, "[p]laintiffs seeking to maintain an opt-in class action bear the burden to show that they are similarly situated with respect to their job requirements and pay provisions." *Kautsch v. Premier Communications*, No. 06-cv-04035-NKL, 2008 WL 294271, at *2 (W.D. Mo. Jan. 31, 2008) (citing *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996)). This showing is usually required after a collective action has been conditionally certified and upon the defendant's motion to decertify, *Freeman*, 256 F. Supp. 2d at 944, or "after the close of discovery, or at least where 'discovery is largely complete and the matter is ready for trial,'" *Huang v. Gateway Hotel Holdings*, No. 4:07CV00702 ERW, 2008 WL 68956, at *2 (E.D. Mo. Jan. 4, 2008) (quoting *Hipp*, 252 F.3d at 1218). Although the plaintiff's burden at this final stage is more strict than at the notice stage, the plaintiff need not show that opt in plaintiffs are "identically situated." *Fast*, 243 F.R.D. at 363. The court considers three factors to determine whether plaintiffs remain similarly situated at the final stage. *Smith*, 404 F. Supp. 2d 1144, 1150 (D. Minn. 2005) (citing *Thiessen*, 267 F.3d at 1103). These factors include: the employment and factual settings of plaintiffs; (2) the various defenses available to defendants; and (3) considerations of fairness, procedure, and manageability. *Id.*; *Kautsch*, 2008 WL 294271, at *2. The district court must assess these factors in light of "the fundamental purpose of 29 U.S.C. § 216(b): (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves 'common issues of law and fact that arose from the same alleged

activity.'" *Kautsch*, 2008 WL 294271, at *2 (quoting *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000)).

Thus, in sum, the level of proof required at each stage in the FLSA collective action certification process is largely dependent upon the amount of information before the court. At the first step, when less information is before the court, plaintiffs simply need to come forward with a "factual basis," *Dietrich*, 230 F.R.D. at 577, a "colorable basis," *Smith*, 404 F. Supp. 2d at 1149, or "substantial allegations," that the existing plaintiffs and putative plaintiffs "were together the victims of a single decision, policy or plan," *Davis*, 408 F. Supp. 2d at 815. At the second step, the court has much more information and is in a position to "make a factual determination on the similarly situated question," *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995), and therefore "plaintiffs must clear a higher hurdle to continue," *Frank*, 2007 WL 2780504, at *3. The "stricter post-discovery standard" requires plaintiffs to convince the court that the factual record reveals putative plaintiffs are still similarly situated to existing plaintiffs. *Smith*, 404 F. Supp. 2d at 1149. Finally, and importantly, whether at the first or second step in the § 216(b) collective action certification process, plaintiffs need not prove the merits of their claim. That is, plaintiffs do not have to show that the employer actually violated the FLSA.[19] *See*

---

[19] Plaintiffs specifically argue this point in their brief, although they fail to cite to any case law to support their argument:

> In order to prevail in requesting this Court to conditionally certify this matter as a collective action, Plaintiffs do not have to prove on the merits that Tyson's 'gang time' is per se illegal (though they could easily do so even at this early stage of the litigation). Plaintiffs only have to prove that they are 'similarly situated' because they are each affected by a common Tyson policy which they are challenging. Thus,

(continued...)

*Smith v. Heartland Automotive Servs., Inc.*, 404 F. Supp. 2d 1144, 1148 (D. Minn. 2005) ("[T]he Court does not consider the merits of Plaintiffs' claims on a decertification motion. . . ."); *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 680 (D. Colo. 1997) ("[W]hether plaintiffs can meet their burden in the liability phase . . . is irrelevant to the question of § 216(b) certification.").

---

[19](...continued)

> while Tyson may dispute the Plaintiffs' claims that Tyson's 'gang time' system is illegal under the [FLSA], Tyson cannot dispute that its uniform 'gang time' pay practices which affect almost all of its hourly employees render this matter suitable for collective action treatment pursuant to the [FLSA].

Dkt. # 59, Pt. 2. Defendant's counter-argument suggests Plaintiffs must prove the merits of their claim at the certification stage: Tyson argues Plaintiffs cannot show that they are similarly situated to potential plaintiffs because plaintiffs "fail to present any evidence of an *unlawful* policy or practice that is common to *all* Storm Lake employees." Dkt. # 49 (emphasis in original). However, Tyson also argues that "[P]laintiffs must demonstrate . . . some similarity binding the named plaintiffs and putative class members as the victims of a particular *alleged* unlawful policy or practice." Dkt. # 49 (emphasis added). Although some district courts in the Eighth Circuit appear to require proof on the merits at the certification stage, *see, e.g.*, *Dietrich*, 230 F.R.D. at 577 ("'Courts have held that plaintiffs *can meet this burden by* making a modest factual showing sufficient to demonstrate that they and potential plaintiffs were victims of a common policy or plan *that violated the law*.'" (emphasis added) (quoting *Hoffman v. Sbarro, Inc.*, F. Supp. 249, 261 (S.D.N.Y. 1997))), the court does not believe plaintiffs have to make such a showing. Instead, the court believes the better policy at the certification stage is simply to determine whether "a class of similarly situated plaintiffs exists." *Smith*, 404 F. Supp. 2d at 1149. Of course, it would be unreasonable to proceed with certification if a plaintiff's claim was meritless or completely deficient, and the court would exercise its discretion to prohibit the § 216(b) certification of plaintiffs in such a case. But it is similarly unreasonable to require actual proof on the merits of plaintiffs' claims at the certification stage, as that is what trial is for. The question at the certification stage, whether during the first step or second step, is whether plaintiffs are similarly situated—not whether plaintiffs can succeed on their claim.

### B. Legal Analysis

### 1. First or second step?

Both parties urge the application of the two-step approach to determine collective action certification, but the parties dispute which step should be undertaken at this time. Plaintiffs argue the court should base its analysis under standards of the first step, or the "notice stage," because Plaintiffs seek conditional certification at this point and, although some discovery has taken place, the record is "woefully inadequate" to make a final decision. Dkt. # 59. Tyson argues the court should skip the first step and base its analysis under the standards of the second step, or "final stage," "because considerable discovery has occurred and an ample factual record has been established." Dkt. # 49.

The parties have completed class discovery. Tyson deposed the six named remaining plaintiffs and twelve potential opt-in plaintiffs, and Plaintiffs deposed four Rule 30(b)(6) witnesses provided by Tyson. Tyson has also responded to twelve interrogatories, produced almost 3,000 pages of responsive documents, and provided payroll data from February 2004 through March 2007. In addition, over thirty employees submitted "declarations" on behalf of Tyson. Because of this limited, but substantial discovery, it is clear to the court that this case is not at a typical "notice stage." *See Parker*, 492 F. Supp. 2d at 1163 ("At the notice stage, the district court makes a decision—usually based only on the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members."). Thus, the court finds support for Tyson's argument that a more demanding standard should be required of Plaintiffs at this point. *See Campbell*, 2001 WL 34152094, at *2 (finding merit in defendant's contention "that the record in this case is beyond that which would warrant the leniency generally given to cases at the notice stage" because the action was "filed nearly a year and a half ago" and "[d]epositions of nearly all named plaintiffs have been taken, Defendants have

responded to two sets of interrogatories, and affidavits in support and opposition to the current motion have been filed"); *Smith v. T-Mobile USA, Inc.*, No. CV 05-5274 ABC (SSx), 2007 WL 2385131, at *4 (C.D. Cal. Aug. 15, 2007) ("Where substantial discovery has been completed, some Courts have skipped the first-step analysis and proceeded directly to the second step.").

However, it is also clear that not all information is before the court, and that Plaintiffs are merely requesting *conditional* certification at this time, for the first time. *See Parker*, 492 F. Supp. 2d at 1164 ("Here, Plaintiffs seek an Order conditionally certifying this case as a collective action, in order to notify all potential plaintiffs of the pendency of this lawsuit and to provide them with the opportunity to opt in. Hence, the Court is at the first stage of the two-stage process."). The court is persuaded by the sentiments of other district courts that

> "beginning with tier one of the analysis is the most equitable means of proceeding. . . . [S]hould the court bypass tier one entirely, some potential plaintiffs might not become aware of the lawsuit and would not have an opportunity to join the suit. . . . The potential prejudice to plaintiffs of bypassing tier one thus is significant."

*Gieseke v. First Horizon Home Loan Corp.*, 408 F. Supp. 2d 1164, 1167 (D. Kan. 2006) (quoting *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 268 (N.D. Cal. 2004)). Therefore, the court does not believe a second stage—i.e., final stage—analysis is prudent at this point in the proceedings. Instead, the court believes the two step process should begin with the first step in this case.

This conclusion, however, is procedural. The two step approach to collective action certification under § 216(b) has both procedural and substantive aspects. Procedurally, the two step approach allows a district court to *conditionally* certify a collective action among

similarly situated plaintiffs, and then revise the certified collective action class later if necessary. Substantively, the two step approach allows a district court to first rely on "substantive allegations" when conditionally certifying a collective action, and then later make a factual determination about the propriety of the certified collective action class. While the court finds the procedural aspect of the two-step approach necessary in this case, it cannot overlook the almost six months of substantial class discovery that the parties have conducted and the valuable information before the court that is relevant to the certification of Plaintiffs' collective action under the FLSA. *See* Dkt. # 23. As a result, the court will apply what it believes is a common sense application of the two step approach in this case: The court will determine whether *conditional* certification of a collective action is appropriate by evaluating all the facts that have thus far been placed before it. Thus, procedurally, the court is not making any final decisions, and Tyson will have an opportunity to later decertify the class if the court approves conditional certification and authorizes notice. Furthermore, substantively, the court will ultimately use the more onerous second stage analysis to account for all the important facts learned through discovery that inform what putative plaintiffs, if any, are similarly situated to existing plaintiffs. Many other courts have done likewise, although not specifically recognizing the procedural/substantive difference. *See Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D. Del. 2007) ("District courts in other circuits have adopted an intermediate approach to the 'similarly situated' inquiry when the parties voluntarily engage in discovery prior to a decision on conditional certification."); *Jimenez*, 2007 WL 4454295, at *3 (stating, because the parties had engaged in six months of pre-certification discovery, that "the Court will review Plaintiffs' allegations and affidavits in conjunction with the evidence gleaned through discovery"); *Thiessen v. General Electric Capital*

*Corp.*, 996 F. Supp. 1071, 1080 (D. Kan. 1998) ("Thus, the court adopts an 'intermediate approach' in analyzing the 'similarly situated' issue.").

### 2.    *Conditional certification*

Plaintiffs request the court to conditionally certify and to approve notice to all potential collective action class members, which Plaintiffs define as:

> All current and former hourly production and support employees of Tyson Foods, Inc., or Tyson Fresh Meats, Inc.'s Storm Lake, Iowa, processing facility who have been employed at any time from February 7, 2004 to the present.

Dkt. # 34, Exhibit A. Plaintiffs indicate February 7, 2004, because the complaint was filed on February 6, 2007, and the FLSA provides a maximum three year statute of limitations. *See* 29 U.S.C. § 255 (providing a three year statute of limitations for willful violations). Plaintiffs also indicate Tyson's Storm Lake facility because the parties voluntarily agreed to dismiss Plaintiffs' claims against Tyson's Denison facility. Dkt. # 40. In their reply brief, Plaintiffs refine their proposed collective action class: "To be clear, Plaintiffs would define the certified collective action 'class' as including all hourly employees who: (1) don, doff, wash or sanitize <u>any</u> sanitary and protective clothing, equipment, and gear; and/or (2) maintain knives, steels and any other tools or equipment that are used in the production process." Dkt. # 59.

Of course, Plaintiffs' defined collective action class must also be considered in light of Plaintiffs' allegations in their FLSA claim. Plaintiffs allege that Tyson violated the FLSA by failing to pay its hourly employees in full. Specifically, Plaintiffs state that Tyson uses an "unlawful compensation system," known as "gang time" or "line time," that fails to compensate

> employees for all required pre-production line and post-production line activities that are necessary and integral to

their overall employment responsibilities, such as: donning and doffing clothing and protective equipment, cleaning and sanitizing that equipment, walking to their lockers and/or production line after already performing compensable activities, and at the end of the work day, walking to the wash stations and then to their lockers and/or supply rooms before the end of compensable time, working on knife maintenance equipment known as "steels" or "mousetraps," and waiting in line to receive required knives, supplies, tools and equipment needed for production line activities.

Dkt. # 2. Plaintiffs recognize that their complaint "alleges that this 'gang time' system violates federal law," but Plaintiffs argue all hourly employees—even those not paid by gang time—"are still similarly situated to all other class members because they are likewise not paid in full." Dkt. # 34. The question for the court now is whether these allegations and the factual record support the conditional certification of Plaintiffs' defined collective action class.

### a. Substantive analysis under the first step

Although the court believes a more demanding analysis is required in this case due to the amount of discovery conducted, the court begins its discussion with a brief analysis of the relevant considerations under the first step. The court believes these considerations support Plaintiffs' request for conditional certification.

Over 300 employees have filed "consents" to opt in to this lawsuit. Therefore, the court easily finds "evidence that other similarly situated individuals desire to opt in to the litigation." *Parker*, 492 F. Supp. 2d at 1164. This supports Plaintiffs' claim for conditional certification. *Id.* The "consents" are also similar to "affidavits" in support of Plaintiffs' claim, and many potential plaintiffs have been deposed. This also supports Plaintiffs' claim for conditional certification. *Olivo*, 374 F. Supp. 2d at 548. Furthermore, there is ample evidence of a "single decision, policy or plan" inasmuch as

most production employees are paid on a gang time basis. *Davis*, 408 F. Supp. 2d at 815. This is another factor that supports conditional certification. Finally, the court finds support for a manageable collective action class because all potential plaintiffs worked or currently work at the same place—Tyson's pork processing plant in Storm Lake, Iowa. The parties acknowledge that the potential collective action class is over 3,000 members, and while this potential class is not insignificant in number, the potential class is not too large or geographically displaced to be considered unmanageable. *See Owens v. Southern Hens, Inc.*, 2008 WL 723923, at * 3 (S.D. Miss. 2008) (noting all potential plaintiffs "are all employees at a single facility"); *Freeman*, 256 F. Supp. 2d at 945 (refusing to permit notice to employees at every Wal-Mart store in the country); *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) (noting "dissimilarities among the putative class members extend to geography, work sites, and payment systems"). Altogether, the court believes these considerations indicate a "factual basis" that similarly situated plaintiffs exist. *See Dietrich v. Liberty Square, L.L.C.*, 230 F.R.D. 574, 577 (N.D. Iowa 2005)).

### b. *Substantive analysis under the second step*

Although the first step analysis generally informs the court that conditional certification is appropriate, the court will not conditionally certify Plaintiffs' collective action class without meeting the more demanding standards under the second step. Thus, the court proceeds by analyzing the relevant factors under the second step.

### i. *Employment and factual settings of plaintiffs*. The six named plaintiffs in this case are all employed, or were employed, in the Kill, Cut, and Retrim Departments at Tyson's Storm Lake, Iowa, facility. Like most employed in the Kill, Cut, and Retrim departments, and like most production employees at Tyson's Storm Lake, Iowa, facility, the named plaintiffs are or were paid on a gang time basis. In fact, of the 1,596 hourly employees currently working at Tyson's Storm Lake, Iowa, facility, only 172 employees

work in departments that are specifically not paid on a gang time basis. These 172 employees represent the 50 employees in the Load Out department, the 22 employees in the Rendering department, and the 100 employees in the Maintenance department. The remaining hourly employees work in the Kill, Cut, and Retrim departments, and these departments are mostly paid on a gang time basis. Tyson has put forth evidence to show that "some" employees in the Kill, Cut, and Retrim departments are, in fact, paid on a non-gang time basis due to special circumstances such as when the employee regularly performs set up and tear down duties before and after gang time. For example, Curtis Muckey, the Processing Supervisor in the Kill department for the A shift, declared that out of the more than one-hundred employees he supervises, about ten team members arrive early and stay late to perform set up and clean up activities. [D. ex. 24]. These employees, even though members of the Kill department, are not paid via gang time but based on the time they clock in and out. There is no doubt, however, that most hourly employees at Tyson, like the named plaintiffs, are paid on a gang time basis.[20]

There is also no doubt that nearly all production employees at Tyson's Storm Lake, Iowa, facility wear some kind of PPE. In fact, out of all the evidence presented to the court, the court can only find one instance in which an employee—a "Stunner" in the Kill Department—is not required to wear some kind of PPE. [D. ex. 11]. But the evidence shows that even Stunners usually choose to wear cotton gloves. [D. ex. 11]. The evidence

---

[20] Plaintiffs allege Tyson employs almost ninety percent of its employees on a gang time basis. This percentage, however, is derived from the approximate 1600 hourly employees and the 172 employees that work in the departments that are specifically not paid via gang time ((1600-172) / 1600 = 89.25%). Thus, it does not account for "some" employees in the Kill, Cut, and Retrim departments that are not paid via gang time. It is obvious, however, that the number of employees paid via gang time is certainly above 75%.

also shows that all other employees are required to wear multiple kinds of PPE, usually consisting of a hard hat, hairnet, hearing protection, a frock, and some kind of boots.[21]

---

[21] For example, the declarations of supervisory personnel at Tyson's Storm Lake, Iowa, facility show that Tyson employees are generally required to wear some kind of PPE. Bill Haukap, Processing Supervisor in the Cut Department for the A shift, declared that all his team members were required to wear a hard hat, hairnet, beard net (if necessary), hearing protection, and a frock. [D. ex. 3]. Rich Devilbiss, General Supervisor in the Materials Handling/Load Out Department for the B shift, declared that his team members are required to wear a hardhat, hearing protection, and steel-toed boots. [D. ex. 4]. Lonnie Woock, General Supervisor in the Rendering Department for the A shift, declared that rendering employees are required to wear a hardhat, hearing protection, and steel-toed boots. [D. ex. 6]. Paul Davis, Maintenance Superintendent for the B shift, declared that maintenance team members are required to wear a hardhat, hearing protection, eye protection, and steel-toed boots. [D. ex. 7]. Moises Gracia, Supervisor in the Retrim Department for the A shift, declared that everyone in the departments he supervises must wear a hard hat, ear protection, hairnet, beardnet (if necessary), frock and rubber boots. [D. ex. 8]. Dan Lindgren, Processing Supervisor in the Cut Department for the B shift, declared that his team members must all wear a hard hat, hairnet, beardnet (if necessary), and hearing protection. [D. ex. 9]. Lori Molan, Supervisor in the Retrim Floor for the B shift, declared that all her employees have to at least wear a hard hat, frock, and hearing protection. [D. ex. 10]. Ron Peters, Supervisor in the Kill Floor for the A shift, declared that everyone must wear the company issued white shirt and pants. [D. ex. 11]. Curt Anderson, Plant Superintendent in the Cut and Retrim Departments for the A shift, declared that all team members must wear frocks. [D. ex. 12]. Randy Story, Supervisor in the Kill Floor for the B shift, declared Kill Floor employees must all wear at least a hard hat, whites (pants and shirt), hairnet, hearing protection, and steel-toed boots. [D. ex. 14]. Curtis Muckey, Processing Supervisor in the Kill department for the A shift, declared that all of his one-hundred or so employees must wear a hard hat, hairnet, beardnet (if necessary), whites, and hearing protection. [D. ex. 24]. Matt Meyer, Supervisor in the Cut Department for the B shift, declared that all of his employees are required to wear some kind of PPE, usually at least a frock. [D. ex. 39]. Finally, Rick Petersen and Kris Jimenes, General Supervisors in the Cut Department, generally declared that all employees are required to wear some sort of PPE, as they frequently see employees don and doff their PPE. [D. ex. 46, 51].

It is also evident, however, that despite the general need for employees to wear PPE for their work, exactly what kind of PPE is required differs greatly among employees. In fact, the declarations of supervisory personnel indicate that "[t]he clothing and equipment that team members wear differs from department to department and position to position." [D. ex. 3-4, 6-14, 24]. Finally, most employees use knives in their work. William Sager, Tyson's Human Resources Manager in Storm Lake, estimated about seventy percent of Tyson's employees use knives, and that knife use is mostly confined to the Kill, Cut, and Retrim departments. [D. ex. 5]. Those employees with knives typically have additional PPE that must be worn, and additional procedures to follow to clean or sharpen their knives.

This summary of the factual circumstances concerning the putative collective action class makes it clear that there are some very big factual differences among hourly employees at Tyson. The putative collective action class may be all employed at the same facility, but they are spread across six different departments that have their own specific duties and supervisors. Moreover, the kinds of PPE worn, the types of tools used, and the compensation system within the departments are often different. Thus, at least with respect to Plaintiffs' defined collective action class, the court does not believe the factual settings of potential plaintiffs support a finding that they are similarly situated.

However, there is a "tie that binds" most all putative plaintiffs together: the gang time compensation system. The putative plaintiffs that are paid via a gang time system are generally similarly situated. They all work in the same location and they are paid by the same general compensation system. Moreover, all of these employees are employed in the Kill, Cut, and Retrim departments, and most all use some kind of knife and wear multiple kinds of PPE. Thus, the court believes the employment and factual settings of plaintiffs support collective action certification if the collective action class is limited to those paid

under a gang time compensation system. *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, (D. Md. 2007) (stating a court should inquire, under the first factor, into "whether Plaintiffs have provided evidence of a company-wide policy which may violate the FLSA, as well as an assessment of Plaintiffs' job duties, geographic location, supervision, and salary." (citing *Thiessen*, 996 F. Supp. at 1081-82)).

*ii.* **Defenses available to Tyson**. Tyson also argues that the disparate facts among employees give rise to individualized defenses that render collective action treatment improper. Specifically, Tyson argues an individualized inquiry is necessary because the court will have to (1) determine which pre-shift and post-shift activities, if any, constitute "work" within the meaning of the FLSA, (2) determine whether individual supervisors knew that employees were performing off-the-clock "work" activities, (3) determine whether any "work" activities are excluded by the Portal to Portal Act because they are not "integral and dispensable," (4) determine whether any compensable work activities are *de minimus*, and (5) determine whether the statute of limitations applies to a particular collective action class member's claim. Dkt. # 49. Plaintiffs respond by arguing that these alleged defenses do not require individualized treatment and are not applicable in this case.

The court does not agree with Plaintiffs that these questions are inapplicable in this case. It is very likely that these questions will be addressed. For example, whether the donning and doffing of PPE is considered work under the FLSA, whether such work is integral and dispensable, and whether any compensable work is *de minimus* are questions often raised in similar cases. *See, e.g.*, *Alvarez v. IBP*, 339 F.3d 894, 902-04 (9th Cir. 2003) ("Accordingly, donning and doffing of all protective gear is integral and indispensable to 'the principal activities for which [the plaintiffs] are employed,' and generally compensable [as work under the FLSA]. However, the specific tasks of donning

and doffing of non-unique protective gear such as hardhats and safety goggles is noncompensable as *de minimus*." (citation ommitted)). The court agrees with Plaintiffs, however, that these questions highlighting Tyson's possible defenses do not disfavor conditional certification because these possible defenses are not as individualized as Tyson wants the court to believe. Tyson's argument that there are individualized defenses is premised on its belief that there are numerous factual disparities among putative plaintiffs. Tyson is correct if the putative collective action class is defined as all hourly employees. But as the court found above, when the putative plaintiffs are limited to those that are paid via a gang time system, there are far more factual similarities than dissimilarities. Moreover, the courts that often address these supposed individualized defenses often do so after collective action certification is granted, such as on summary judgment or on appeal. *See De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 364-65 (3d Cir. 2007) (determining these questions on appeal from a denial of summary judgment and after collective action certification was approved). Thus, the court is not persuaded that this factor supports Tyson's argument for individual, rather than collective, treatment in this case, so long as the collective action class is limited to those that are paid via a gang time system.

       ***iii.    Fairness, manageability, and procedural considerations***. Tyson argues it is unfair to certify Plaintiffs' proposed collective action class because Tyson would be forced to defend against *un*common evidence. Tyson points to the fact that none of the six named plaintiffs work in the Rendering, Materials Handling, or Maintenance departments, and that all six named plaintiffs admitted they could not testify as to the PPE worn by other departmental employees, the methods used to compensate other departmental employees, or how long others in their production areas spend donning and doffing their PPE.

Without common evidence to defend against, Tyson argues it is an unfair burden to certify the collective action against it. Plaintiffs do not specifically rebut this argument.

The court again agrees with Tyson that, concerning all hourly employees that don and doff PPE or maintain knives and steels and other tools in the production process, it would be unfair to Tyson to have to defend against all the dissimilarities among these hourly employees. But again, if the collective action class is limited to those paid via a gang time system, the similarities outweigh the dissimilarities, and a fair playing field is created. The collective action class is also manageable for the court, and the court sees no procedural considerations that weigh against the certification of a collective action class that is limited to hourly employees paid via a gang time system.

## C. Conditionally Certified Collective Action Class

The court finds the potential plaintiffs are not similarly situated regarding Plaintiffs' originally defined collective action class. Plaintiffs' attempt to persuade the court that all hourly employees are similarly situated fails because a blatant and significant difference exists between the named plaintiffs and some of those they wish to include in the collective action class. That difference is that not all hourly employees are paid via a gang time system. *See Kautsch*, 2008 WL 294271, at *2 ("Plaintiffs seeking to maintain an opt-in class action bear the burden to show that they are similarly situated with respect to their job requirements and pay provisions.").

The court does believe, however, that potential plaintiffs are similarly situated if the collective action class is limited to only those production employees that are paid via gang time. Gang time, after all, is the company-wide policy that Plaintiffs claim violates the FLSA. Moreover, Plaintiffs acknowledged in their brief a significant amount of employees are not paid via gang time, and that the court could limit the collective action class to only those that are paid via gang time. The court also believes this resolution properly takes

into account the "fundamental purpose" of the FLSA by lowering the costs to plaintiffs and efficiently resolving the issues in one proceeding. *Id.* Furthermore, it is well within the court's discretion to refine Plaintiffs' proposed collective action class in this manner. *See Baldridge v. SBC Comm'ns, Inc.*, 404 F.3d 930, 931-32 (5th Cir. 2005) ("[T]he class certification order here is subject to revision before the district court addresses the merits. As we have noted, the court has already used its discretion to modify the original certification order to limit the scope of the class and has scheduled a date to consider decertification before trial begins." (footnote omitted)). Finally, due to the fact that the court is proceeding *procedurally* under the first step of collective action certification, this court's decision simply *conditionally* certifies the redefined collective action class. Thus, Tyson has every opportunity to move to decertify or further limit the class in the future. *See Rawls*, 244 F.R.D. at 299 (addressing defendant's motion to decertify conditionally certified class).

In coming to this conclusion, the court distinguishes the facts in the unpublished decision, *Fox v. Tyson Foods, Inc.*, No. 4:99-CV-1612-VEH (N.D. Al Nov. 15, 2006), submitted to the court as Defense exhibit 1. Dkt. #s 45, 49. In *Fox*, the district court denied FLSA class certification to plaintiffs from eight different Tyson chicken processing facilities located in seven different states. [D. ex. 1, p. 1]. In denying FLSA collective action certification, the court noted the "inter-plant and intra-plant inconsistencies" between the plaintiffs, and that the evidence showed "Tyson does not have a single plan to not compensate employees for donning and doffing time." [D. ex. 1, p. 13-14]. In this case, there is only one Tyson facility involved, and all named plaintiffs are paid via gang time. Gang time, of course, is a uniform compensation plan. In addition, to the extent that *Fox* suggests the court needs to determine the merits of Plaintiffs claim in the instant case, the court strongly disagrees with any such proposition.

In the end, the court grants Plaintiffs' motion for the conditional certification of the following collective action class:

> All current and former employees of Tyson's Storm Lake, Iowa, processing facility who have been employed at any time from February 7, 2004, to the present, and who are or were paid under a "gang time" compensation system in the Kill, Cut, or Retrim departments.

The court does not believe it is necessary to include anything in the collective action class definition about donning and doffing, PPE, or knives and other equipment, because the evidence reveals that those employed in the Kill, Cut, and Retrim departments all don and doff some sort of PPE and/or use some kind of knife or tool. The court is satisfied this redefined collective action class is similarly situated under the FLSA. The notice and specific orders regarding the conditional certification of Plaintiffs' collective action under the FLSA are set forth in the conclusion and order of this opinion.

## V. IWPCL CLASS ACTION

Plaintiffs also seek class certification of their IWPCL claim pursuant to Federal Rule of Civil Procedure 23. Plaintiffs specifically seek certification of a class defined as follows:

> All current and former hourly production and support workers of Defendant Tyson's Storm Lake, Iowa, meat processing facility who have been employed by Tyson at any time from February 7, 2005, to the present.

Dkt. # 35. The date is the only material difference between the Plaintiffs' requested Rule 23 class and their requested FLSA collective action class. Plaintiffs chose February 7, *2005*, as the pertinent date for their Rule 23 class action because the IWPCL provides for a two-year statute of limitations. *See Waterman v. Nashua-Plainfield Cmty. School Dist.*,

446 F. Supp. 2d 1018, 1027 (N.D. Iowa 2006) ("The statute of limitations for an IWPCL action is two years from the time the action accrues." (citing Iowa Code § 614.1(8))).

The requirements for certification under Rule 23 are set forth by the rule, which was recently amended[22] to read as follows:

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
>
> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

---

[22] Rule 23 was amended last year, but only to reflect a general restyling of the rules. Thus, although the parties briefed these issues under the old language of the rule, it does not change the import of their arguments.

>    (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
>    (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>    (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
>    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
>    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
>    (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23. "To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). "[T]he court must conduct a 'rigorous analysis' to ensure that the prerequisites of Rule 23 are satisfied." *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982)). "Though class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove." *Elizabeth M.*, 458 F.3d at 786.

### A. Rule 23(a) Legal Standards And Analysis

There are four "threshold requirements" under Rule 23(a) that plaintiffs must meet to be certified as a class. *Owner-Operator Independent Drivers Ass'n, Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1011 (8th Cir. 2003). These requirements include:

> (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Id.* (citing FED. R. CIV. P. 23(a)). The United States Supreme Court has summarized these four requirements as: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Tyson concedes Plaintiffs meet the numerosity requirement, but Tyson argues Plaintiffs fail to meet the remaining three elements. The Supreme Court has recognized that these three remaining requirements all "tend to merge," but this court will first address each of them separately. *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 158 n.13 (1982).

### 1. Commonality

Commonality, as a threshold element for Rule 23 class certification, "requires that there be common questions of law or fact among the members of the class," but it "does not require that every question of law or fact be common to every member of the class." *Paxton v. Union Nat. Bank*, 688 F.2d 552, 561 (8th Cir. 1982). Instead, commonality may be satisfied "when the legal question linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (quotations omitted). "Thus, factual differences are not fatal to

maintenance of the class action if common questions of law exist." *Robinson v. Sears, Roebuck & Co.*, 111 F. Supp. 2d 1101, 1120 (E.D. Ark. 2000).

Plaintiffs claim they meet this commonality requirement because they all share the common question of "whether Defendant Tyson has violated [the IWPCL] by not paying production workers at its Storm Lake, Iowa, facility for all work performed prior and subsequent to 'gang time,' particularly the time spent donning, doffing, and cleaning personal protective equipment." Dkt. # 35. Tyson argues there "is no single question of law or fact that is common to every member of the putative class" because "there is nothing 'uniform' about the pay practices at the Storm Lake facility." Dkt. # 45.

Tyson's argument is largely correct regarding the entire class Plaintiffs defined—all hourly production and support workers. There is no uniform pay practice regarding all hourly production and support workers. However, and as the court found when analyzing the propriety of FLSA collective action certification, there undoubtedly is a uniform pay practice among *most* employees at Tyson's Storm Lake facility. Tyson admits that "it has utilized the same compensation system at all times relevant to the Complaint," and "that most of the hourly production workers" at its Storm Lake facility "are paid on 'gang time,' plus four minutes a day for pre- and post-shift activities." Dkt. # 15. In fact, as the court found in its FLSA collective action analysis, over 75% of Tyson's nearly 1,600 employees are paid via gang time.

Because Plaintiffs have alleged violations of the IWPCL based on Tyson's alleged "unlawful compensation system," which Plaintiffs define as the use of "gang time," Dkt. # 2, the commonality element cannot be met with regard to those employees who are not paid via gang time. The factual difference between the payment system for employees paid on gang time and the employees not paid on gang time is significant and cannot be ignored. After all, Plaintiffs plainly note the gang time payment system as the basis for their

lawsuit, Dkt. # 2, and Plaintiffs assert they meet the commonality requirement for class certification by stating all plaintiffs share the common question of "whether Defendant Tyson has violated [the IWPCL] by not paying production workers at its Storm Lake, Iowa, facility for all work performed prior and subsequent to 'gang time,'" Dkt. # 35. Certain employees in the requested class, however, are not paid under gang time. Therefore, there is not commonality between the class representatives, who are all workers in the departments paid via gang time, and the requested class members who are not paid via gang time.

But the commonality element is satisfied with respect to most of the class members, i.e., those class members that are paid on a gang time basis. Plaintiffs, of course, allege that such a practice violates the IWPCL, and, thus, there is a common question of law specific to all of the employees paid on a gang time basis. Tyson points to numerous factual differences regarding the clothing and equipment employees wear, even among those paid on a gang time basis, but the court is not convinced these factual differences defeat commonality among all employees paid on a gang time basis. All employees paid on a gang time basis wear some sort of PPE, and all store their PPE in the same lockers, at the same plant, and all are required to don and doff their PPE. In addition, most all use some kind of knife, and also a scabbard or steel. The small factual differences between those employees that are paid on a gang time basis "are not fatal to maintenance of the class action [because a] common question[] of law exist[s]." *Robinson*, 111 F. Supp. 2d at 1120. That question is whether Tyson's gang time compensation system violates the law. Because "[a]ll current and former hourly production and support workers" are not all paid via gang time, Plaintiffs' requested class does not meet the commonality requirement under Rule 23(a)(2). But the court is satisfied that the proposed class, if redefined and confined to hourly employees paid under Tyson's gang time compensation

system, meets the commonality requirement. *See Felix De Asencio v. Tyson Foods, Inc.*, No. CIV.A 00-CV-4294, 2002 WL 1585580, at *2 (E.D. Pa. July 17, 2002) ("Here, the common questions of law and fact revolve around the allegations that Tyson has violated the WPCL by not paying the New Holland facility production workers for all work performed prior and subsequent to "line time," particularly the time spent donning, doffing, and cleaning protective equipment and garments."), *rev'd on other grounds*, *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301 (3d Cir. 2003).

## 2. *Typicality*

"The burden of showing typicality is not an onerous one." *Paxton*, 688 F.2d at 561. In fact, the analysis of typicality tends to merge with the analysis of commonality, *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 158 n.13 (1982), although the Eighth Circuit Court of Appeals has "given typicality 'an independent meaning' by holding that Rule 23(a)(3) 'requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff.'" *Paxton*, 688 F.2d at 561 (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)). Typicality "is generally considered to be satisfied 'if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory.'" *Id.* at 561-62 (quoting C. Wright & A. Miller, Federal Practice and Procedure § 1764 at n.21.1 (Supp. 1982)). However, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M.*, 458 F.3d at 787.

Tyson again argues there are "wide factual variations" between the named plaintiffs and putative plaintiffs that preclude a finding of typicality. The court agrees with respect to Plaintiffs' proposed class definition. All hourly employees are not typical of each other because some are not paid via a gang time compensation system. However, if the class

is confined to employees paid via gang time, the typicality requirement is met because their claims are based on the same legal theory—that Tyson's gang time compensation system is unlawful. In addition, among gang time paid employees, the evidence only shows factual differences regarding the specific PPE these employees wear and the tools they carry. The court does not feel these differences necessitate individualized inquiry to prove a violation because most all gang time employees wear at least the same basic PPE and use some kind of knife or tool. Moreover, there is not an indefinite amount of PPE to don and doff or tools to be used, and thus the factual variations between employees paid via gang time are limited. Again, as with the court's finding concerning commonality, those employees that are not paid via gang time do not have the "same or similar" grievance as the class representatives because the class representatives are or were paid on a gang time basis. *Donaldson*, 554 F.2d at 830. Thus, the court only finds the typicality requirement met with respect to a class defined as those employees that are paid via gang time.

### 3. *Adequacy of representation*

"The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562-63. The Supreme Court has advised that the adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.

Tyson does not dispute that Plaintiffs' counsel is qualified to vigorously prosecute the interests of the class, but Tyson does dispute whether the class representatives have common interests with the members of the class. Tyson specifically points to the fact that the named plaintiffs do not represent all the different job positions or even departments in the putative class. The six remaining named plaintiffs—Mario Martinez, Peg Bouaphakeo,

53

Javier Frayre, Heribento Renteria, Jesus A. Montes, and Jose A. Garcia—have never worked in the Rendering, Material Handling/Load Out, or Maintenance departments.

Of course, if all six departments were relatively similar, particularly in regard to how the employees were paid, the named plaintiffs' inexperience in the Rendering, Load Out, and Maintenance departments would not matter much. The possibilities for conflicts of interest between class representatives and class members are obviously minimal when all plaintiffs in an IWPCL class action perform similar work and receive compensation under a similar pay system. But in this case the chances for conflicts of interest are greater because there is a significant difference, at least with respect to how they are paid, between most of the hourly employees in the Kill, Cut, and Retrim departments, and the hourly employees in the Rendering, Material Handling/Load Out, and Maintenance departments. That difference, of course, is that the Rendering, Material Handling/Load Out, and Maintenance departments are not paid via gang time.

The significance of this difference is highlighted by the Supreme Court's admonition that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem*, 521 U.S. at 625 (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Broadly defined, the interest and injury in this case is the desire to recover payment for work performed that allegedly was not paid. Plaintiffs' complaint, however, belies such a broad definition. Plaintiffs' complaint is littered with allegations of Tyson's "unlawful compensation system," which Plaintiffs unequivocally assert as Tyson's use of "a system known as 'gang time' or 'line time.'" Dkt. # 2. While all named plaintiffs work in departments paid under this gang time system, the same cannot be said for all requested class members. In such a case, the court finds the named plaintiffs do not adequately represent all of the requested

class. However, if the class is limited to those employees paid by gang time, the court sees no conflicts between the class representatives and those they represent.

### 4.    *Merged result*

The commonality, typicality, and adequacy of representation requirements of Rule 23(a) "tend to merge" because they "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tele. Co. of Southwest*, 457 U.S. at 158 n.13. Whether looked at individually, or when the elements of Rule 23(a) are merged together, it is obvious to the court that the three disputed Rule 23(a) elements are not satisfied when the class is defined as all hourly production and support employees. Not all hourly employees are paid via gang time, which is the compensation system Plaintiffs allege is unlawful. However, it is also clear that if the class is redefined or confined to only those hourly employees paid via gang time, the requirements of Rule 23(a) are met, including the numerosity requirement. Tyson did not dispute numerosity, and even under what is redefined as a smaller class, it is clear that numerosity is easily satisfied, when most of Tyson's 1600 employees are paid via a gang time system.

It is well within the court's authority to redefine Plaintiffs' proposed class. *See, e.g.*, *Robinson*, 111 F. Supp. 2d 1101 (E.D. Ark. 2000) (granting "plaintiffs' motion for class certification as modified"); Wright, § 1759 at 130-131 & n.28 ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23."). The court finds it appropriate to do so at this point. Therefore, the court will next analyze whether a class

defined as those hourly employees paid on a gang time basis at Tyson's Storm Lake, Iowa, facility meet one of the subsections of Rule 23(b).

### B. Rule 23(b) Legal Standards And Analysis

Parties seeking class certification must also show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem*, 521 U.S. at 614. Plaintiffs do not claim they meet the requirements under Rule 23(b)(2), as that rule "permits class actions for declaratory or injunctive relief." *Id.* Plaintiffs claim they meet the requirements under either Rule 23(b)(1) or (3).

### 1. Rule 23(b)(1)

The Supreme Court summed up the purposes and requirements of Rule 23(b)(1) in *Amchem*:

> Rule 23(b)(1) covers cases in which separate actions by or against individual class members would risk establishing "incompatible standards of conduct for the party opposing the class," or would "as a practical matter be dispositive of the interests" of nonparty class members "or substantially impair or impede their ability to protect their interests." Rule 23(b)(1)(A) "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners." Rule 23(b)(1)(B) includes, for example, "limited fund" cases, instances in which numerous persons make claims against a fund insufficient to satisfy all claims.

521 U.S. at 614 (citations omitted); *see Reynolds v. Nat'l Football League*, 584 F.2d 280, 283 (8th Cir. 1978) (explaining certification under Rule 23(b)(1)(A) and (B)).

Subdivision (A) is intended to allow class certification when individual actions could have an adverse effect on the defendant. Wright, § 1773 at 10. Thus, the provision attempts to protect the party opposing the class. Under subdivision (A), "there obviously must be a risk that separate actions will in fact be brought if a class action is not permitted. Otherwise there is no danger that incompatible standards of conduct will be formulated by the courts." Wright, § 1773 at 11. In this case, there certainly is a risk that separate actions will in fact be brought—many potential plaintiffs are aware of the suit, as several hundred have filed consents at least with respect to the FLSA claim. However, the court does not see how individual lawsuits achieving different results would impair Tyson's ability to pursue a uniform continuing course of conduct. Tyson would not be put in a conflicted position simply because Tyson might have "to pay damages to some class members but not to others or to pay them different amounts." Wright, § 1773 at 13; *see Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 99 (W.D. Mo. 1997) ("Although individual lawsuits might end with different results, this does not justify certification of the class [under Rule 23(b)(1)]."). Thus, the court agrees with Tyson that Plaintiffs have not met their burden of proving class certification is appropriate under subdivision (A).

Subdivision (B) is intended to allow class certification when individual actions could have an adverse effect upon the putative plaintiffs. Wright, § 1774 at 24 ("Rule 23(b)(1)(B) allows class actions to be brought in cases in which separate suits might have undesirable effects on the class members, rather than on the opposing party."). Under subdivision (B), and unlike subdivision (A), "it is not necessary to demonstrate that separate actions are likely or feasible in order to invoke Rule 23(b)(1)(B)." Wright, § 1774 at 25. It simply needs to be shown that individual actions would, "as a practical matter," be dispositive, impair, or impede the interests of other members not parties to the

individual lawsuit. Plaintiffs argue that "[m]ost, if not all, of these workers lack the financial resources to litigate alone against a corporate giant like Tyson Foods." Dkt. # 35. Subdivision (B), however, is not really concerned with the financial resources of individual plaintiffs, but rather the financial resources of the defendant. *See In re Fed. Skywalk Cases*, 680 F.2d 1175, 1187 (8th Cir. 1982) ("A class action may be certified under Rule 23(b)(1)(B) when a number of individuals claim rights to a share of a fund that is too small to satisfy in full every individual's claim."). That is why Rule 23(b)(1)(B) is invoked in "limited fund" circumstances, whereby individual actions may deplete the limited amount of monetary recompense available and leave some individuals without a remedy. That is not the case here, and thus the court does not find Subdivision (B) applies to Plaintiffs' situation. Wright, § 1773 at 25 (noting the purpose of Subdivision (B) is "to protect the interests of all class members against any determination that would have an adverse effect on them").

## 2. *Rule 23(b)(3)*

"In general . . . a Rule 23(b)(3) action is appropriate whenever the actual interests of the parties can be served best by settling their differences in a single action." Wright, § 1777 at 114. To be certified under Rule 23(b)(3), Plaintiffs must satisfy the "predominance" and "superiority" components of the rule. *Amchem*, 521 U.S. at 615. These requirements were added "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Id.* (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697). Rule 23(b)(3) specifically lists four factors pertinent to the court's determinations regarding predominance and superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3).

Under the first factor, the court does not foresee a great interest among individual plaintiffs in proceeding individually. Such individualized adjudications would be financially burdensome, and some individual plaintiffs may not stand to gain a significant remedy. On the other hand, the advantages of determining the common issues by means of a class action are apparent, as all employees in the class could finalize their claims in one proceeding. Under the second factor, the class representatives have already conducted a substantial part of discovery, and thus individual adjudications would duplicate work already performed. Under the third factor, Tyson's Storm Lake, Iowa, facility is located within the Northern District of Iowa, and there is no reason why this District Court would not be a desirable forum for the litigation. All the evidence is very close. Under the fourth factor, the court does not foresee problems of manageability. No indication of counter-claims are present, and the size of the class is not too large or dispersed among several Tyson plants.

Regarding the predominance inquiry, the "court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Blades*, 400 F.3d at 566. In other words, the court must look at the nature of the evidence plaintiffs would have to come forward with to establish a prima facie case, and if "the members of the proposed class will need to present evidence that varies from member to

member, then it is an individual question." *Id.* In this case, class members need to prove that they are not paid for all the work they perform under Tyson's gang time compensation system. To do so, the class members would need to show that they perform work which goes unpaid, which Plaintiffs claim is the time they spend donning and doffing their PPE or cleaning their equipment. Clearly, not all employees paid on gang time wear the same PPE or use the same equipment. However, common evidence that Tyson's compensation system cannot account for even the basic or standard PPE employees need to don, doff, and clean would establish a prima facie case for the class. Individual questions may exist, but the court does not believe they predominate.

Regarding the superiority inquiry, the court is to compare the possible alternatives to a class action and determine if any is superior to the proposed class action. The alternatives to class action litigation in this case are individual lawsuits by class members. There is no doubt this would be more burdensome on the class members, and it would likely be less efficient use of judicial resources. *See Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234-35 (9th Cir. 1996) ("Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation."). Under such circumstances, the court finds the superiority requirement met.

### C. Certified Class Action

Based on the above analysis, the court finds that Plaintiffs' motion for class action certification under Rule 23 should be granted as modified. That is, the court hereby certifies in accordance with Rule 23(c)(1)(B) the following class under Rule 23(b)(3):

> All current and former employees of Tyson's Storm
> Lake, Iowa, processing facility who have been employed at

> any time from February 7, 2005, to the present, and who are
> or were paid under a "gang time" compensation system in the
> Kill, Cut, or Retrim departments.

The notice and specific orders regarding the certification of Plaintiffs' class action under Rule 23 are set forth in the following conclusion and order.

## VI. CONCLUSION AND ORDER

The court finds Plaintiffs can maintain their FLSA and IWPCL actions together. The FLSA does not preempt Plaintiffs' IWPCL claim, and the differences between the collective action and class action procedures do not require the court to dismiss, deny, or limit Plaintiffs' IWPCL claim.

The court also **grants, as modified** by the court's revised definitions, *see infra* Parts IV.C, V.C, Plaintiffs' motion for conditional certification of their FLSA claim as a collective action under § 216(b), *see* Dkt. # 34, and Plaintiffs' motion for certification of their IWPCL claim as a class action under Rule 23, *see* Dkt. # 35.

The class members of both the FLSA collective action and the Rule 23 class action deserve notice of the Plaintiffs' claims and their opportunity to "opt-in" or "opt-out" as the case may be. *See* FED. R. CIV. P. 23(c)(2)(B) ("For any class that is certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."); Wright, § 1807 at 485 ("[The FLSA requires that notice be given to allow plaintiffs to opt in. . . ."). Because the classes are identical (except for a temporal difference)[23] and there is likely confusion to arise among members receiving two

---

[23] Regarding the temporal difference, the court believes it is important to note that
(continued...)

notices, the court believes the best course of action is to authorize and craft one notice that informs all opt-in members and all opt-out members of their rights. The court orders **Plaintiffs to submit a draft proposed notice** that meets the requirements of the FLSA[24]

---

[23](…continued)

the statute of limitations operates differently in class actions and collective actions. *See* Wright, § 1807 at 476 ("Another difference flowing from the opt-in requirement is the treatment of the statute of limitations."). The filing of Plaintiffs' complaint tolls the statute of limitations for the Rule 23 class action members "until the class certification decision has been made, or until an individual class member opts out." *Id.* Under the FLSA,

> [a]n action is considered to be commenced, for statute of
> limitations purposes, either (1) when the complaint is filed, if
> the plaintiff is named in the complaint and filed a written
> consent to become a party at the time the complaint was filed;
> or (2) on the date a consent to become a party was filed, if the
> plaintiff was either unnamed in the complaint or failed to file
> a consent at the time the complaint was filed.

*Fyre v. Baptist Memorial Hosp., Inc.*, No. 07-2708 Ma/P, 2008 WL 2117264, at *3 (W.D. Tenn. May 20, 2008) (citing 29 U.S.C. § 256(a) and *Piper v. RGIS Inventory Specialists, Inc.*, No. C-07-00032 (JCS), 2007 WL 1690887, at *6 (N.D. Cal. June 11, 2007)). The court does not believe this difference necessitates specifying a different date in the FLSA collective action class definition, although this principle will be important when addressing Tyson's statute of limitations affirmative defense. Dkt. # 15.

[24] The FLSA does not specifically state what kind of notice must be given, but other sources provide insight. *See generally* Wright, § 1807 at 485-487, 493 n.57.

and Rule 23(c)(2)(B)[25] **within ten days**. Tyson shall have **five days to respond** to Plaintiffs' draft, and thereafter the court will finalize the proposed notice.

The six named plaintiffs—**Peg Bouaphakeo**, **Javier Frayre**, **Jose A. Garcia**, **Mario Martinez**, **Jesus A. Montes**, and **Heribento Renteria**—are **designated as class representatives for the collective and class actions**, and the court **appoints the lead counsel of record** for Plaintiffs, under the standards in Rule 23(g), as class counsel for Plaintiffs' IWPCL class action and FLSA collective action. The court also orders **Tyson to provide within twenty days** to Plaintiffs' counsel a listing of the names and addresses of all Tyson employees that meet the court's definition of the FLSA collective action class and IWPCL class action class in this case. Further orders shall accompany the court's finalization of notice.

---

[25] Rule 23(c)(2)(B) states:

> For any class that is certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:
> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

FED. R. CIV. P. 23(c)(2)(B).

**IT IS SO ORDERED.**

**DATED** this 3rd day of July, 2008.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA