IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION - SIOUX CITY

PEG BOUAPHAKEO, et al.,

    Plaintiffs,

vs.

TYSON FOODS, INC.,

    Defendant.

Civil No. 5:07-cv-04009-JAJ-TJS

## ORDER FOR FINAL PRETRIAL CONFERENCE

A final pretrial conference was held in the above matter pursuant to Fed. R. Civ. P. 16 on October 21, 2010.

1.     The following counsel, who will try the case, appeared at the conference:

For the plaintiff:

Robert L. Wiggins
Candis A. McGowan
Jacob A. Kiser
Daniel E. Arciniegas
Wiggins, Childs, Quinn & Pantazis LLC
The Kress Building, 301 North 19th Street
Birmingham, AL 35203
(205) 314-0500

Brian P McCafferty
Kenney & McCafferty, PC
3031 C. Walton Road, Suite 202
Plymouth Meeting, PA 19462
(610) 940-0327

MacDonald Smith
Smith & McElwain
505 Fifth Street, Suite 530
Sioux City, IA 51101
(712) 255-8094

Roger K. Doolittle
Doolittle and Doolittle
460 Briarwood Drive
Suite 500
Jackson, Mississippi 39206-3060
(601) 957-9777

Michael Hamilton
Provost Umphrey Law Firm, LLP
2021 Richard Jones Road, Suite 300
Nashville, TN 37215
(615) 242-0199

1

2. For the defendant:

| | |
|---|---|
| Michael J. Mueller | Richard J. Sapp |
| Evangeline C. Paschal | Ryan Koopmans |
| Hunton & Williams LLP | Frank B. Harty |
| 1900 K. Street, NW | Nyemaster, Goode, |
| Washington, DC 20006 | Hansell & O'brien, P.C. |
| (202) 419-2116 | 700 Walnut Street, Suite 1600 |
| | Des Moines, IA 50309-3899 |
| | (515) 283-3173 |

Accordingly,

**IT IS ORDERED**

I.. **STIPULATED FACTS:** The parties agree that the following facts are true and undisputed:

1. Tyson Fresh Meats, Inc. is a wholly-owned subsidiary of Tyson Foods, Inc.

2. Tyson Fresh Meats, Inc. owns and operates a pork-processing facility in Storm Lake, Iowa, where hogs are slaughtered and processed.

3. Tyson Foods, Inc. is a Delaware corporation, with its principal place of business in Arkansas.

4. Tyson Fresh Meats, Inc. is a Delaware corporation, with its principal place of business in South Dakota.

5. Tyson Foods has been engaged in interstate commerce or in the production of goods for interstate commerce throughout the relevant time period.

6. The "production" areas of the Storm Lake plant include Kill, Cut, and Re-trim.

7. This case was brought by six named Plaintiffs: Peg Bouaphakeo, Mario Martinez, Javier Frayre, Heribento Renteria, Jesus Montes, and Jose Garcia.

8. The six named Plaintiffs are pursuing this case as a class action. The named plaintiffs are seeking to make a claim on behalf of all of the employees under Iowa law. In addition, some of the employees in this case are making a claim under a federal law known as the Fair Labor Standards Act.

9. The Iowa plaintiffs are those current and former hourly production employees who

worked in the Kill, Cut or Retrim areas of the Storm Lake plant at some point between February 7, 2005 and July 3, 2008, although they may have continued to work after that date as well. This is known as the "state class" or "Iowa class." There are 3,781 employees in this class.

10. The federal plaintiffs are those current and former hourly, production employees who worked in the Kill, Cut or Retrim areas of the Storm Lake facility at some point after March 31, 2004, and who filed consent-to-join forms with the Court on or after March 31, 2007.(This is known as the "federal class" or "the "FLSA class". There are 432 employees in this class, including the six named Plaintiffs.

11. The main production departments at the Storm Lake facility are the kill department, the cut department, and the "re-trim" department. These three departments contain approximately 1,300 hourly workers. Each of these departments typically run two shifts daily.

12. Approximately 1,300 hourly workers are employed in the Kill, Cut, and Re-trim production areas at the Storm Lake facility.

13. The Kill, Cut, and Re-trim production areas at the Storm Lake facility operate on both an A shift and B shift.

14. Both shifts of the kill department total approximately 380-400 hourly workers. Both shifts of the cut department total approximately 440-460 hourly workers. Both shifts of the Re-trim department total approximately 440-450 hourly workers.

15. The kill department slaughters the hog, removes the internal organs, sends the head, feet and internal organs to the evisceration room, and sends the carcass to the cooler for cold storage. The carcass is the two "sides" of the hog which contain edible meat. The cut department breaks the chilled carcass down into its "primal pieces" which is smaller parts such as front shoulder, loins, bellies, hind quarters and hams. Some items are packed for shipment to customers or other Tyson plants in the cut department and others are sent to the Re-trim department for further processing. The retirm or conversion department involves the further processing of hams and loins and additional trimming of those products.

16. Employees using knives on the job are required to don, doff and wear or use some combination of a plastic belly guard, mesh apron, mesh sleeve, plexiglass arm guard, mesh glove, Polar glove, membrane skinner gloves, Polar sleeves, "steel" for maintaining knives, and knife scabbards ("knife-related" items, equipment or activities hereafter).

17. Employees are required to stow such knife-related items and equipment in their lockers at the end of their shift except for items that require or need laundering or items that require or need replacement.

18. "Sanitary items" include such items as the frock, hairnet, beard net, cotton and rubber

3

gloves, rubber apron and rubber sleeves.

19. Hourly production workers are required to wear a hard hat, a hairnet, a beard net (if they have facial hair), and earplugs or ear muffs while on the production floor. Additional items required to be worn are listed on a form for each particular position known as a Job Safety Analysis, or JSA.

20. Non-knife wielding employees may also don and doff rubber gloves, cotton gloves and rubber or plastic aprons.

21. Workers in the Cut and Re-trim processing areas are required to wear a fabric frock over their street clothes while on the production floor.

22. Workers in the Kill area wear a fabric white shirt and pants ("whites") provided by Tyson, except that workers may choose to wear their own light-colored shirt and pants instead of the Tyson-issued.

23. Production employees go to their lockers at the start of their shift to obtain their individual supply bag in which Tyson has put their sanitary items and equipment that requires laundering between shifts, such as the company-issued frock, cotton gloves, Polar gloves, and Polar sleeves.

24. Knife-wielding employees must also go to their lockers at the start of their shift to retrieve their knife-related items and equipment.

25. The parties agree that donning, doffing and rinsing the following items is compensable: mesh apron, belly guard, steel, scabbard, mesh glove, Polar glove, Polar sleeve, plexiglass arm guard, mesh sleeve, and membrane skinner gloves.

26. There are time clocks located at the entrances of the kill, cut and re-trim departments.

27. At all relevant times, Tyson has had a policy and practice requiring workers to swipe an identification card each day, before and after their shift. The swipe generally is used to register attendance.

28. The production time for which an employee is paid may be less than the time between the swipe in and swipe out, but the swipe in/swipe out does not measure production time. Plaintiffs object to relevance.

29. Although the time clocks record the time that hourly workers punch the clock to the minute, Tyson does not use such recorded time to determine an employee's compensable hours or pay. The time clocks are generally used to record attendance.

4

30. Workers are required to be at their work stations on the production floor at their scheduled start time.

31. Employees are not supposed to perform work on the production line without wearing all of the required sanitary and protective items and equipment for their position. They are disciplined if they are not wearing their required sanitary and protective items and equipment.

32. Employees are also required to remove some of their sanitary and protective items and equipment, including their frock (if applicable) before entering the rest room. Employees are only permitted to wear their white shirt and pants, hair net, hard hat, earplugs, and boots into the restroom (whether personally provided or company-provided).

33. From 1998 until February 4, 2007, Tyson paid four "extra" minutes beyond production time to all production employees as compensation for donning and doffing and related activities. Tyson calls this "K Code" time.

34. On February 4, 2007, the company added its calculation of the pre- and post-shift walking time at the Storm Lake facility to the amount of time employees in various job positions were determined in 1998 to spend performing the various pre- and post-shift activities.

35. From February 4, 2007 to June 28, 2010, Tyson ceased paying non-knife-wielding employees for their time spent donning and doffing company-issued sanitary and protective items and equipment. [Defendant agrees that this statement is accurate but contends that it is not relevant to the issues of this case and is subject to a pending motion in limine.]

36. On June 28, 2010, Tyson resumed paying non-knife wielding employees for donning and doffing and related activities at the rate of 20 to 23 extra minutes per day beyond their gang time pay. [Defendant agrees that this statement is accurate but contends that it is not relevant to the issues of this case and is subject to a pending motion in limine.]

37. From February 4, 2007 to June 28, 2010, Tyson paid knife wielding employees between 4 and 8 extra minutes in addition to production time for donning and doffing their protective items and equipment and related activities. [Defendant agrees that this statement is accurate but contends that it is not relevant to the issues of this case and is subject to a pending motion in limine]. Plaintiffs dispute that anyone was actually paid 8 extra minutes.

38. After February 4, 2007, K code time ranged from 4 to 8 minutes a day for anyone who received it, and the amount of time depended on the job; employees who did not work with a knife received no K code time after February 4, 2007. Plaintiffs dispute that anyone was actually paid 8 extra minutes.

39. Prior to February 4, 2007, K code time was intended by Tyson to compensate employees who worked in any department where a knife was used for donning, doffing, and rinsing

5

of certain equipment that is unique to the meat-processing industry. Specifically, the 4 minutes of K code time was intended to pay for time spent on the following activities: pre- and post-shift donning and doffing of the mesh apron, belly guard, steel, scabbard, mesh glove, Polar glove, Polar sleeve, plexiglass arm guard, mesh sleeve, and membrane skinner gloves; post-shift gathering of the equipment just mentioned; walking from the production line to the wash stations; post-shift waiting at the wash stations and rinsing of clothing and equipment; and pre- and post-shift "dipping" of some equipment in a sterilizing solution and any time spent waiting at the dip tanks.

40. Starting February 4, 2007, K code time was paid only to employees who used a knife, but the number of minutes was increased to cover the time spent walking before shift from the locker room to the production floor, and walking after shift from the wash station to the locker room.

41. Before June 28, 2010, production workers at Storm Lake got two breaks during a typical 8-hour shift. The first break was a paid 15-minute break, and the second break was an unpaid 30 minute break.

42. On June 28, 2010, Tyson increased the 15-minute break to 25 minutes, with 20 minutes of the break being unpaid time and five minutes being paid time. The 30-minute break was increased to 35 minutes, with 30 minutes of the break being unpaid time and five minutes being paid time. Also as of that date, production employees are paid five minutes preshift and five minutes post-shift, as well as up to three additional minutes, for a total of 20 to 23 minutes. [Defendant agrees that this statement is accurate but contends that it is not relevant to the issues of this case and is subject to a pending motion in limine.]

43. Since June 28, 2010, all hourly production employees have received at least 20 paid minutes each shift for activities they perform outside of production time, both before and after each shift and during breaks, including but not limited to any time spent taking off, putting back on, or washing certain protective clothing and equipment and walking to and from the production line. This extra 20 minutes of paid time provides all hourly production employees five minutes of paid time for certain pre-shift activities, five minutes of paid time for certain post-shift activities, and five minutes of paid time for certain activities performed during the first two breaks during a shift. [Defendant agrees that this statement is accurate but contends that it is not relevant to the issues of this case and is subject to a pending motion in limine.]

44. Production employees at the Storm lake facility are "guaranteed hours" of paid time up to a certain number of hours per week for a certain number of weeks per year that they reported to work.

45. Hourly workers at the Storm Lake plant tend to work a significant amount of overtime on a weekly basis.

46. Hourly, non-clerical employees who work 40 or more hours in a week are entitled to be paid overtime at a rate of time-and-one-half of their regular rate of pay.

6

47. Wage rates at the Storm Lake plant for hourly production employees in 2009 ranged from a starting wage of $11 per hour to a maximum of $15.50 an hour.

**II. EXHIBITS:** The parties exhibit lists, objections and stipulations are set forth in the chart attached hereto in the form previously approved by the Court.

**III. WITNESSES:** The parties' witness lists were exchanged previously pursuant to the Court's Scheduling Order and are incorporated herein by reference.

**IV. FACTUAL ISSUES**

**A. PLAINTIFFS' FACTUAL ISSUES:**

1. Plaintiffs contend that Tyson and the previous decision in *Reich v. IBP, Inc.* has already determined that wages must be paid for donning and doffing activities of employees who use some combination of a plastic belly guard on their job, mesh apron, legging apron mesh sleeves, plexiglass arm guards, leg aprons, cut-resistant gloves (Kevlar) mesh gloves, polar gloves, membrane skinner gloves, polar sleeves, knives, "steel" for maintaining knives, knife scabbards, saws, rubber boots, a chain belt, a weight belt ("knife-related" gear and equipment or activities hereafter). *See Reich v. IBP*, 820 F.Supp. 1315 (D. Kan. 1993), *affirmed* 38 F.2d 1123 (10th Cir. 1994); *remedies on remand*, 1996 WL 137817 (D. Kan. 1996), *affirmed sub. nom.*, *Metzler v. IBP, Inc.*, 127 F.3d 959 (10th Cir. 1997).

2. The only issue to be tried for knife wielding employees is the amount of time it takes them to perform the activities at issue and whether the defendant has paid the necessary wages or overtime for that amount of time. Because Tyson and the decision in *Reich* have already determined such knife-related activities to be compensable and Tyson has been paying part of the time necessary to perform such activities since the *Reich* decision, the plaintiffs are not required to show or prove that the such activities are (a) "work"; (b) a "principal activity" or "integral and indispensable" to a principal activity; or (c) sufficiently significant or ascertainable to be non-*de minimis*. Tyson cannot deny that such activities are compensable when it has already determined that they are. Defendant is collaterally estopped from further litigation of such issues for the knife-related activities determined to be compensable at the Storm Lake plant in *Reich, supra*. The Storm Lake plant is still subject to a permanent injunction in *Reich* to pay wages for such knife-related activities and the only factual issue remaining open is whether it has, in fact, paid for the full amount of time necessary to perform such activities.

3. Plaintiffs contend that the following activities are compensable because they occur during the "continuous workday" between plaintiffs' first compensable activity at the start of the workday and the last such compensable activity at the end of the workday: (a) donning and doffing

7

their remaining sanitary and protective gear and equipment such as the company-issued frock or "whites", cotton gloves, rubber gloves, plastic or rubber armsleeves, plastic or rubber apron, hairnet, beardnet, ear plugs, and boots; (b) walking from the lockers where such items are obtained or donned to the production line at the start of the shift; (c) washing or sanitizing such items or the employees' hands or gloves; (d) waiting for production to begin on the production line; (e) walking from the production line to the locker room or other areas where such items are stored, hung or deposited at the end of the shift or during the unpaid portion of breaks;(f) donning, doffing, washing, or sanitizing such items during the unpaid portion of breaks; and (g) walking back to the production line during the unpaid portion of breaks after gathering or donning, washing or sanitizing such items or the employees' hands or gloves. Wages must be paid for all such non-knife-related activities that occur during the "continuous work day", which is defined as the time between the first compensable activity at the beginning of a shift and the last such activity at the end of the shift. Plaintiffs also contend that all such activities are compensable because donning and doffing of all knife-related and non-knife related sanitary gear and equipment is integral and indispensable to plaintiffs' principal activity, including all activities related to the company-issued plastic belly guard, mesh apron, legging apron mesh sleeves, plexiglass arm guards, leg aprons, cut-resistent gloves (Kevlar) mesh gloves, polar gloves, membrane skinner gloves, polar sleeves, knives, "steel" for maintaining knives, knife scabbards, saws, rubber boots, a chain belt, a weight belt, frock or "whites", cotton gloves, rubber gloves, plastic or rubber armsleeves, plastic or rubber apron, hairnet, beardnet, ear plugs, etc..

4. For non-knife wielding employees, the jury must determine whether obtaining or donning one or more of the following items of sanitary and protective gear and equipment was a "principal activity" or "integral and indispensable" to a principal activity: the company-issued frock or "whites", cotton gloves, rubber gloves, plastic or rubber armsleeves, plastic or rubber apron, hairnet, beardnet (if applicable), ear plugs, hardhat or boots. The following activities are compensable because they occur during the continuous workday commenced by obtaining or donning one or more of the foregoing items of sanitary and protective gear and equipment: (a) donning the remainder of such employee's sanitary gear and equipment; (b) washing or sanitizing one or more of such items at the start or end of a shift or during the unpaid portion of breaks; (c) walking from the locker room where such activities occur to the production line at the start of the shift or on return from breaks; (d) waiting for the production line to begin at the start of the shift or during unpaid breaks; (e) walking from the production line to the locker room or other area where one or more of such items are doffed, hung or stored at the end of the shift or during the unpaid portion of breaks; (f) donning, doffing, washing, or sanitizing such items during the unpaid portion of breaks; and (g) walking back to the production line during the unpaid portion of breaks after gathering or donning, washing or sanitizing such items or the employees' hands or gloves.

5. The unpaid activities at issue in this case are principal activities and/or integral and indispensable to plaintiffs' principal activities because they are required by Tyson, necessary for plaintiffs and the class to perform their jobs and are performed primarily for Tyson's benefit to allow it to produce and sell wholesome, uncontaminated meat products and to avoid or reduce expensive workplace injuries and other liabilities.

8

6. In addition to the stipulated facts already set forth above, the following are additional factual issues known at the current time:

   a. Employees using knives on the job are required to don, doff and wear a legging apron, cut-resistant Kevlar gloves, a chain belt, a weight belt, and to carry knives to the production line on unpaid time.

   b. Employees are required to stow their non-laundered gear and equipment in their lockers on unpaid time at the end of the shift, to retrieve those items on unpaid time at the beginning of their next shift, and, if necessary, obtain replacement items at the supply room on unpaid time.

   c. Employees are not permitted to carry their supply bag into the production area. Employees must leave their supply bag at their lockers and return all sanitary gear and equipment that is required to be laundered to their supply bags at the end of the shift.

   d. Before paid time begins, each employee must go to their locker where the defendant has placed the employee's supply bag, unpin the bag, remove the gear and equipment in the bag and don such gear and equipment before proceeding to the production line where paid time begins.

   e. The order and sequence of donning such gear and equipment is controlled, in part, by what must be put on before and after the company-issued frock.

   f. Knife-wielding employees must don the plastic belly guard before putting on their frock because the belly guard is worn under the frock.

   g. Knife-wielding employees that wear whites rather than a frock don the plastic belly guard after putting on their shirt.

   h. In walking the physical route between the entrance to the plant and the entrance to the production area, the locker room is reached before the first punch clock. The locker room is approximately past the plant entryway and the first punch clock is past the locker room.

   i. After obtaining their sanitary and protective gear and equipment from their lockers and individual supply bags, employees must perform the following activities before arriving at the production line where paid time begins: (a) don such gear and equipment; (b) walk from the lockers where such gear and equipment are obtained or donned to the production line at the start of the shift; and (c) wash and sanitize hands, water-resistant gloves and/or other sanitary gear and equipment as needed.

   j. At the end of the shift and the beginning of breaks, production employees must: (a) walk from the production line to the locker room or other areas where their sanitary and protective gear and equipment are stored, hung or deposited at the end of the shift or during the unpaid portion of breaks; (b) don, doff, wash, or sanitize parts of such items during the unpaid portion of breaks;

9

and (c) walk back to the production line during the unpaid portion of breaks after gathering, donning, washing and sanitizing their hands, gloves or other sanitary or protective items as needed.

      k.      During breaks, employees are required to remove all knife-related gear and equipment.

      l.      Tyson Foods merged with IBP in 2001 and has operated the Storm Lake plant since then.

      m.      Tyson pays its Storm Lake hourly production workers in the kill, cut and conversion departments on a "gang time" basis. "Gang time" is the time that production lines are moving and operating, and during which production workers are physically at the assembly line while the lines are moving and producing product. "Gang time" does not record time that production workers spend donning, doffing, and cleaning their sanitary and protective gear and equipment at the start and end of a shift or during unpaid breaks.

      n.      On June 28, 2010, Tyson increased the extra minutes or K-Code time for knife-wielding employees from 4 to 7 minutes to 20-26 minutes per day.

      o.      The K-Code times of 4-8 minutes and 20-26 minutes were instituted pursuant to the permanent injunctive requirement in *Reich* that "Defendant shall implement recordkeeping practices sufficient to record the time spent by each employee in performing the pre-shift and post-shift activities found to be compensable under the Act." *Reich* permanent injunction, *supra* at ¶3.

      p.      Tyson has described the increase in K-Code minutes from 4-7 minutes in 2007-2009 to 20-26 minutes beginning June 28, 2010 as follows:

> Defendant added "K-Code" minutes and restructured the workday by making the following changes:
>
> - An additional 15-16 minutes are now paid on top of the prior "K-code" minutes for the time the employees spend putting on clothing and equipment, cleaning up, and walking to and from their workstations, bringing the total "K-Code" minutes to 20 to 26 depending on an employee's position.
>
> - The 15 minute paid break was lengthened to 25 minutes, with 5 minutes being paid for donning and doffing and 20 minutes unpaid.
>
> - The 30-minute lunch break was lengthened to 35 minutes, with 5 minutes being paid for donning and doffing and 30 minutes unpaid.

(Dkt. 156-1, citing TSE-00196765-66).

10

q. "Extra" or K-Code minutes are based on the amount of time necessary to perform the various pre- and post-shift activities found to be compensable in the prior case of *Reich v. IBP*, 820 F.Supp. 1315 (D. Kan. 1993), *affirmed* 38 F.2d 1123 (10th Cir. 1994); *remedies on remand*, 1996 WL 137817 (D. Kan. 1996), *affirmed sub. nom., Metzler v. IBP, Inc.*, 127 F.3d 959 (10th Cir. 1997).

r. In 1988, the United States Department of Labor filed the civil complaint in the case that came to be known as *Reich v. IBP*, seeking injunctive and other relief for employees at IBP, Inc.'s non-union facilities, including the Storm Lake facility, at issue in this case for the time spent on the types of knife-related pre- and post-shift activities at issue in this litigtion. *See* Dkt. 137-1 at ¶43.

s. The district court in *Reich v. IBP* held that IBP should pay for the reasonable time spent by knife-wielding employees donning, doffing and cleaning the "unique" PPE that they wore, as well as time as the wash stations post-shift. The Tenth Circuit affirmed the liability ruling on slightly different grounds.

t. The district court entered an injunction in *Reich v. IBP* requiring IBP to pay employees for the pre- and post-shift activities found to be compensable. *See* Dkt. 137-1 at ¶45.

u. On April 13, 1998, IBP began paying most employees at its non-union facilities, including all knife users as well as other employees in any department that contained a knife-user, an additional four minutes per day for the activities held to be compensable in *Reich*.

v. K-Code minutes were instituted to satisfy the following terms of the permanent injunction entered in *Reich* for the Storm Lake plant:

> On March 31, 1996, the Court issued its Memorandum and Order, holding that Defendant had violated and is continuing to violate the overtime and recordkeeping provisions of the Fair Labor Standards Act of 1938, as amended 29 U.S.C. §201, *et seq.*
> Pursuant to that Memorandum and Order, it is hereby:
> ORDERED, ADJUDGED and DECREED that Defendant, its officers, agents, servants, employees, and those persons in active concert or participation with it who receive actual notice of this judgment be, and each of them hereby is, permanently enjoined and restrained from violating the provisions of sections 15(a)(2) and 15(a)(5) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 *et seq.*), hereinafter called the Act, at its meatpacking establishments located in . . . Storm Lake, Iowa . . . , in any of the following manners:
> 1. Defendant shall not, contrary to sections 7 and 15(a)(2) of the Act, employ any of its employees . . . for workweeks longer than 40 hours without compensating such employee for his or

11

her employment in excess of 40 hours per workweek at a rate not less than one and one-half times the regular rate at which he or she is employed.

\* \* \*

3. It is further ORDERED that, within ten (10) days of the date of this Order, Defendant shall implement recordkeeping practices sufficient to record the time spent by each employee in performing the pre-shift and post-shift activities found to be compensable under the Act.

*Reich v. IBP, Inc.*, permanent injunction entered July 30, 1996; *see also Reich v. IBP, Inc.*, 1996 WL 137817 (D. Kan. 1996), *affirmed sub nom., Metzler v. IBP, Inc.*, 127 F.3d 959 (10th Cir. 1997).

w. The actual and reasonable amount of time it takes to perform the activities at issue in this case is in excess of 26 minutes for knife-wielding employees and in excess of 23 minutes for non-knife-wielding employees.

## B. DEFENDANT'S FACTUAL ISSUES:

1. Whether donning, doffing, and rinsing of standard sanitary and protective items is considered "work."

2. Whether donning, doffing, and rinsing of standard sanitary and protective items involves physical or mental exertion.

3. Whether some of the items at issue are not required in certain positions and are worn only at the employee's choice for their comfort or convenience.

4. Whether the safety and sanitary items at issue are primarily for the benefit of the Plaintiffs.

5. Whether donning, doffing and rinsing of standard sanitary and protective items are integral and indispensable to the principal job which the Plaintiffs are employed to perform.

6. Whether donning, doffing and rinsing of standard sanitary and protective items are essential to the jobs Plaintiffs are employed to perform.

7. Whether the activities at issue commence or end the continuous workday.

8. What is the minimum time necessarily spent on the activities.

9. Whether the activities in question are de minimis.

10. Whether the activities constitute insignificant amounts of time beyond an employee's scheduled working hours that cannot be precisely recorded for payroll purposes as a practical matter.

11. Whether it is practical for Tyson to precisely record the time for payroll purposes.

12. Whether the activities are not regular because they occur at various times, places, paces or on different days.

13. Whether Plaintiffs have already been paid for some or all of the activities through the payment of "K code" time or guaranteed hours, or by being paid by punch out on certain days.

14. Whether Tyson conducted thorough and accurate time-studies at its plants to determine an appropriate amount of additional time to be paid to knife-wielding employees.

15. Whether Plaintiffs' or Defendant's time-study experts conducted a relevant and reliable measure of the activities at issue.

16. Whether there is representative or common evidence that applies to each member of the two classes.

17. The amount of damages, if any.

## V. LEGAL CONTENTIONS

### A. Plaintiff's Legal Contentions:

1. To prevail, plaintiffs are not required to establish that each of the contested activities are "work" or "integral and indispensable" to a principal activity because all activities occurring after the first such integral and indispensable activity are automatically compensable as part of the Department of Labor's "continuous workday" rule that the Supreme Court recognized in *IBP v. Alvarez*, 546 U.S. 21, 29 n.3 (2005) ("'Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked.'", quoting 29 C.F.R. § 790.6(a)); *see also id.* at 38 (holding that "during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is . . . covered by the FLSA.").

2. For knife-wielding employees, plaintiffs contend that the first compensable act that begins the continuous workday is the act of obtaining and donning one or more items of the company-issued gear and equipment that has already been held to be compensable, and that the Storm Lake plant was permanently enjoined from treating as non-compensable in *Reich, supra*. All other activities at issue in this case for knife-wielding employees follow such compensable knife-related activities and are therefore automatically compensable as part of the Department of Labor's

13

"continuous workday" rule set forth above. Plaintiffs contend the same analysis applied to non-knife wielding plaintiffs based on their obtaining and donning one or more items of their sanitary gear and equipment at the start of their shift which commences the continuous work day for which compensation must be paid for all the remaining activities at issue in this case.

3. Plaintiffs contend that defendant Tyson is collaterally estopped from denying the compensability of the knife-related gear and activities held to be compensable, and enjoined to be compensated at the Storm Lake Plant in *Reich v. IBP*, 820 F.Supp. 1315 (D. Kan. 1993), *affirmed* 38 F.2d 1123 (10th Cir. 1994); *remedies on remand*, 1996 WL 137817 (D. Kan. 1996), *affirmed sub. nom.*, *Metzler v. IBP, Inc.*, 127 F.3d 959 (10th Cir. 1997).

4. Plaintiffs request that the calculation of individual amounts of backpay for each plaintiff and class member be bifurcated so that the jury trial will be limited to the issues of liability, the number of minutes it takes to perform the contested activities, and the number of such minutes that have not been paid. With those determinations, the individual backpay amount for each class member will be a ministerial matter based on arithmetic and the defendant's computerized time and payroll records.

5. The defendant has notified plaintiffs that it does not contest whether the plaintiffs have satisfied the wilfulness standard for extending the limitations period to three years for all plaintiffs, opt-in plaintiffs and class members.

6. The defendant has withdrawn any contention or defense of good faith.

7 The trial of this case involves no issue related to class or collective certification or decertification. Those issues have been resolved in this Court's class certification decision reported as *Bouaphakeo v. Tyson Foods, Inc.*, 564 F.Supp.2d 870 (N.D. Iowa 2008). Class and collective certification and decertification would be procedural issues for the Court, not a jury.

8. Plaintiffs' other legal contentions are set forth in the Section IV.A above as part of plaintiffs' Factual Issues.

### B. Defendant's Legal Contentions:

1. Donning, doffing, and washing of standard sanitary and protective items (e.g., frock, whites, hard hat, hair net, ear plugs, boots, safety glasses, plastic apron, plastic sleeves, cotton gloves, plastic gloves) are not "work." Such activities do not require physical or mental exertion. Some of the items at issue are not required in certain positions and are worn only at the employee's choice for their comfort or convenience. Some items can be worn from and to home. The safety items are exclusively for the benefit of the Plaintiffs, as they are intended to protect them from cuts, bumps and hearing loss. In addition, the sanitary items provide equal benefit to the Plaintiffs, as they keep food byproducts off of the Plaintiffs' clothes and bodies or keep them warmer and drier.

14

2. Donning, doffing and washing of standard sanitary and protective items are not integral and indispensable to the principal job which the Plaintiffs are employed to perform, i.e., process pork. As noted above, some of the items are not required, and all of the items either primarily benefit the Plaintiffs or equally benefit the Plaintiffs. Further, one could process and cut meat without wearing the items at issue and thus they are not essential to the jobs. In addition, workers can wear certain items from and to home.

3. Because the activities at issue are neither "work" nor "integral and indispensable" to the Plaintiffs' jobs, they cannot commence or end the continuous workday. In addition, because the activities are de minimis, they cannot commence or end the continuous workday even if the activities by themselves would otherwise be compensable.

4. The activities are de minimis because they constitute insignificant amounts of time beyond an employee's scheduled working hours that cannot be precisely recorded for payroll purposes as a practical matter. This is so because the amount of time necessarily or reasonably spent by the Plaintiffs each day is small, it is not practical for Tyson to precisely record the time for payroll purposes, and the activities are not regular because they occur at various times, places, and paces and do not even occur every day or in the same order every day.

5. In addition, many of the Plaintiffs have already been paid for some or all of the activities through the payment of "K code" time that was specifically intended to compensate for the activities at issue.

6. Even if Tyson were liable to some or all of the named Plaintiffs, there is no class-wide liability, either to the FLSA opt-ins or to the state-law Plaintiffs. The Plaintiffs are not similarly situated, in that there was no common decision, policy or plan that violated the FLSA. In addition, each Plaintiff presents individualized circumstances. There is no common evidence that supports class-wide liability and does not vary from individual to individual. The Court's prior conditional certifications of the two classes does not bind the jury, and the plaintiffs are required to prove at trial the elements of their claims for each class member to recover on a class-wide basis.

7. Defendant opposes Plaintiffs' requested bifurcation of damages from the liability phase of the trial. Plaintiffs first raised this issue on October 14, 2010, after both sides had exchanged proposed jury instructions on the damages issue and had listed multiple trial exhibits relating to damages. Bifurcation would unduly prejudice Defendant because one of its defenses is that it has already paid for some or all of the activities at issue. Bifurcation at this late date should also be denied as a waste of resources.

## VI. LEGAL ISSUES

A. **Plaintiff's Legal Issues:** In addition to the foregoing legal contentions, plaintiffs' understanding of the remaining disputed legal issues comes from the parties' differences set forth

15

in their respective jury instructions and motions in limine, including, without limitation, the following:

1.\. Defendant's proposed instruction No. 11 is mistaken in stating that "[t]o prevail plaintiffs must prove by a preponderance of the evidence that [the contested] activities are work." Such activities are compensable if they occur within the "continuous workday" regardless of whether they constitute "work" standing alone. *See Alvarez*, 546 U.S. at 29 & n.3, 38; 29 C.F.R. §790.6. Even activities like waiting or sitting are compensable if they occur during the continuous workday. Tyson cannot single-out particular activities as non-compensable during the continuous workday. The continuous workday begins with the first "principal activity" or activity that is "integral and indispensable" to such a principal activity. 29 C.F.R. §790.6. Plaintiff need not show that the activity alleged to start the continuous workday is "work" or that any subsequent activities are work.

2\. Defendant's proposed instruction No. 11 is also mistaken in stating that to be "work" an activity must be "controlled or required by Tyson Foods" and "primarily benefit Tyson Foods." Activities that Tyson "suffers or permits" are fully compensable regardless of whether they are "controlled or required" by Tyson or "primarily benefit" Tyson. 29 U.S.C. § 203(g); see also 29 C.F.R. § 785.6. "Hours worked" includes time which Tyson knew or should have known was being spent performing the contested activities. Such knowledge and awareness is undisputed in this case. Tyson concedes in its proposed instruction no. 11 that "exertion" is not required to be "work", and "it makes no difference how easy or difficult the activity is [or] how long it takes."

3\. Tyson's proposed instruction No. 12 errs in stating that plaintiffs must prove an activity "primarily benefit[s] the employer" in order to be "integral and indispensable" to a principal activity, and that "it is not enough from Tyson Foods to have received some benefit from the activity or that Tyson Foods and the employee equally benefit" from the activity."

4\. Tyson's proposed instruction No. 14 errs in stating that: (a) the continuous workay commences only with the first principal activity rather than an activity that is integral and indispensable to such a principal activity; (b) that the first activity commencing the continuous workday must be determined to be "work"; (c) that a *de minimis* activity cannot commence the continuous workday; (d) that only time "necessarily spent" during the continuous workday is compensable; and (e) that the employer can deduct time spent during the continuous workday "socializing" or that "primarily benefit the employee."

5\. Tyson's proposed instruction No. 15 errs in stating that "the continuous workday does not start when an employee first touches a compensable clothing item" and "must" be measured only "from the point at which the employee actually begins to put that item on." Touching and donning plaintiffs' sanitary and protective gear and equipment is a seamless activity that does not permit the type of hair-splitting argued by Tyson.

6\. Tyson's proposed instruction at No. 17 errs in stating that *de minimis* time must be determined "[for] each employee separately", that time can be *de minimis* if "justified by industrial

16

realities", that *de minimis* time must be determined by "the reasonable, not the actual amount of daily time spent by an employee on the activities."

7. Tyson's proposed jury instruction No. 17 further errs in stating that "[n]ot all of the factors need to be proven for you to find that the activities were de minimis, that Tyson's *de minimis* defense must be based only on time that "was not compensated by Tyson Foods", that "[i]n considering whether the total amount of time for which compensation is sought is *de minimis*, you should consider only the uncompensated time", and that "[i]n considering whether the total amount of unpaid time is *de minimis*, it is appropriate for you to include paid nonproduction time in your analysis."

8. Tyson's proposed instruction No. 17 also errs in stating that time spent during the continuous work day may be plucked-out of such workday and determined to be *de minimis* because it is not "work" standing alone or in isolation from the other activities that form the continuous workday.

9. Tyson's proposed instruction No. 18 errs in stating "[t]he plaintiffs in this case do not claim that they have not been paid for the time that they performed production work at the Storm Lake facility", that "this case involves non-production related activities that occur before and after shift and at the meal period" and that "[b]asing hourly pay in whole or in part on gang time is not, by itself, illegal, and the legality of gang time is not at issue in this case."

10. Tyson's proposed instruction No. 20 errs in stating that the jury is not permitted to "consider the fact that Tyson Foods changed its workday or changed the number of K code minutes paid in determining whether Tyson Foods is liable for the activities at issue in this case."

11. Tyson's proposed instruction No. 22 errs in stating that " plaintiffs do not claim that Tyson Foods has failed to pay them for a rest break."

12. Tyson's proposed instruction No. 13 errs in stating: "If you find that employees were given the option as a practical matter to change into or wash any required items at home, such changing or washing is not considered a principal activity, even if employees elected to change or wash at the plant. Similarly, at the end of the shift, any changing or washing that could have taken place at home as a practical matter, even if employees elected not to do so, does not constitute a principal activity."

13. Plaintiffs' pending motions in limine set forth the remaining legal issues currently known to exist.

**B. Defendant's Legal Issues:**

Plaintiffs have devoted their Legal Issues section to challenging Defendant's previously filed proposed jury instructions. Defendant does not believe that the pretrial order is the appropriate place

17

for debating jury instructions or that Plaintiffs' narrative arguments are what is contemplated by the December 8, 2009 pretrial order or Local Rules. In addition, Defendant did not learn that Plaintiffs were taking this approach until October 14, 2010. For these reasons, Defendant has not addressed Plaintiffs' arguments in its Legal Issues section. Defendant will be prepared to address the parties' respective proposed jury instructions at the final charge conference or, should the Court request, at any earlier time.

1. Whether Plaintiffs' donning, doffing and rinsing activities qualify as "work" to be principal activities that are compensable under the FLSA as Plaintiffs allege.

2. Whether Plaintiffs' donning, doffing and rinsing activities are "preliminary" or postliminary," and therefore not compensable under the Portal-to-Portal Act, 29 U.S.C. § 254, or are "integral and indispensable" to a principal activities and therefore compensable.

3. Whether any donning, doffing and rinsing activities during the 30-minute meal period are compensable under the FLSA, where the 30-minute meal period is a bona fide meal period under the case law interpreting the FLSA.

4. Whether the time Plaintiffs spent engaged in donning, doffing and rinsing activities pre- and post-shift and during the meal period is de minimis, and therefore non-compensable, under the FLSA.

5. Whether Plaintiffs are similarly situated to each other, to the proposed class members, or to any other person or persons for purposes of the FLSA or Plaintiffs' claims can be proven with common evidence for purposes of the state law claim.

6. Whether a de minimis act can commence or end the continuous work day.

7. Whether items that can be worn from home as a practical matter are compensable such that their donning and doffing on the plant premises can start and end the continuous workday.

8. Even if compensable, whether the continuous work day begins with the first touch of a compensable item to be donned and ends with the last touch of a compensable item to be doffed.

9. Even if compensable, whether pre- and post-shift time is limited to the minimum time necessarily spent, or the reasonable time spent, on those activities (e.g. whether non production time that is not donning, doffing or rinsing time (e.g. socializing) is compensable pre- and post-shift).

10. Whether Plaintiffs may recover statutory interest, attorney fees, and costs.

Defendant also anticipates that several evidentiary issues may arise during the course of trial. Such issues are addressed in the parties' motions in limine, filed on October 7, 2010.

18

**IT IS SO ORDERED.**

**DATED** this _____ day of _____, 2010.

_____
**THOMAS J. SHIELDS
CHIEF U.S. MAGISTRATE JUDGE**