IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| PEG BOUAPHAKEO, et al., individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>TYSON FOODS, INC.,<br><br>        Defendant. | No. 5:07-cv-04009-JAJ<br><br><br><br>**ORDER** |

This matter comes before the court pursuant to plaintiffs' July 1, 2010 motion for partial summary judgment [dkt. 124]. Defendant resisted plaintiffs' motion on July 26, 2010 [dkt. 135]. Plaintiffs filed their reply brief on August 5, 2010 [dkt. 137].

Also pending is defendant's July 1, 2010 motion for partial summary judgment on plaintiffs' claim for activities performed during the meal period [dkt. 123]. Plaintiffs resisted defendant's motion for partial summary judgment on July 26, 2010 [dkt. 134]. Defendant filed a reply brief on August 5, 2010 [dkt. 136]. Defendant filed notices of supplemental authority in support of its motion for summary judgment on September 3, 2010 [dkt. 140] and February 7, 2011 [dkt. 188].

The undersigned heard oral arguments on the pending motions for summary judgment (as well as the pending motions in limine) on February 14, 2011. As set forth below, plaintiffs' motion for partial summary judgment is denied. Defendant's motion for partial summary judgment is denied.

# I. SUMMARY JUDGMENT - THE STANDARD

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir. 1986). Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on which it will bear the burden of proof at trial, there are genuine issues of material fact." Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985) (quoting Impro Prod., Inc. v. Herrick, 715 F.2d 1267, 1272 (8th Cir. 1983)).

The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. Id.

# II. STATEMENT OF MATERIAL FACTS

Defendant's Storm Lake, Iowa facility is a hog slaughter and processing facility that employs approximately 1,500 hourly production workers. The main production departments or "floors" at the Storm Lake facility are the kill floor, the cut floor, and the

conversion ("re-trim") floor.  These floors form the large majority of the hourly workforce and total approximately 1,300 hourly workers.  Each of these floors typically run two shifts daily.  Both shifts of the kill floor total approximately 380 to 400 hourly workers.  Both shifts of the cut floor total approximately 440 to 460 hourly workers.  Both shifts of the conversion floor total approximately 440 to 450 hourly workers.

The kill floor slaughters the hog, removes the internal organs, sends the head, feet and internal organs to the evisceration room, and sends the carcass to the cooler for cold storage.  The carcass consists of the two "sides" of the hog which contain edible meat.  The cut department breaks the chilled carcass down into its "primal pieces" which are smaller parts such as the front shoulder, loins, bellies, hind quarters and hams.  Some items are packed for shipment to customers, and others are sent to the conversion department for further processing.  The retrim or conversion floor involves the further processing of hams and loins and additional trimming of those products.

All Tyson production workers at the Storm Lake plant wear at least some items of personal protective equipment ("PPE").  All Tyson Storm Lake production workers are required to wear hard hats, ear plugs, boots and some type of gloves.  Tyson Storm Lake production workers wear and use some combination of the following items of PPE and tools/gear: frocks, hard hats, ear plugs, hair nets, hard plastic arm guards, mesh aprons, mesh sleeves or Kevlar sleeves, scabbards, cotton gloves, rubber gloves, cut-resistant (Kevlar) gloves, and mesh gloves.  Knife users are also issued knives and a "steel" by the company, which is a tool used to keep a sharp edge on a knife.  Not all hourly production employees, however, wear mesh aprons or mesh gloves and whether knife-using employees use a plastic arm guard, Kevlar sleeves, or mesh sleeves depends on the position.  Further, cotton gloves are optional for production employees and not all employees wear rubber gloves.

Employees' protective clothing and PPE (mesh sleeves only) are laundered by

Tyson after each shift and put in a laundry bag clean and hung in the lockers of the production employees. Items that are not laundered are kept in the employees' lockers between shifts, e.g., plastic arm guards, mesh aprons, knives, scabbards, hard hats, ear plugs, and possibly mesh sleeves (if not laundered). With the exception of hard hats and boots, employees are not permitted to take items of PPE home. Production workers who use knives are issued knives, scabbards, and steels by the company.

Tyson Storm Lake hourly production workers must have all required and cleaned PPE on before the first piece of meat product reaches their work station. Employees are not permitted to perform work on the production line without wearing all required PPE and they are disciplined if they are not wearing their required PPE. Tyson pays its Storm Lake hourly production workers on the kill, cut, and conversion floors, in part, on a "gang time" basis, assuming that they do not punch in after the start of "gang time" for that line. "Gang time" is the time that the processing lines are moving and during which production workers are physically at the assembly line while the lines are moving and producing product. In and of itself, "gang time" does not record time that production workers spend donning, doffing, and cleaning themselves and their PPE before and after "gang time" and at unpaid meal breaks.

In addition to "gang time" Tyson currently pays its hourly production workers "extra" minutes per day to compensate them for donning, doffing and washing their PPE. Prior to February 4, 2007, Tyson paid its production workers four additional minutes per day for donning and doffing their PPE if they worked in a production department such as kill, cut or retrim/conversion. The number of additional minutes paid was jointly determined by IBP (Tyson's predecessor) and the United States Department of Labor for pre-shift and post-shift donning, doffing and cleaning of "unique" PPE items, and the post-shift walk from the work station to the wash basin. The payment of "extra" minutes beyond the "gang time" for donning and doffing activities is referred to as "K Code" time.

4

Commencing on February 4, 2007, the Storm Lake facility changed the "K Code" time to pay workers who must wear PPE to between four and eight minutes per day, the exact number depending on the employee's job position.

As of October 2008, the wage rates at the Storm Lake facility for hourly production employees ranged from a starting wage of $11 per hour to a maximum of $15.50 per hour. Employee William Sager roughly estimated that the average hours per week for 2008/2009 in the kill, cut and retrim floors was up to 48 hours, although some weeks the employees only worked 40 hours.

During breaks, employees are required to remove all knives, scabbards, and arm guards. Before using the rest room, employees must remove their sanitary and protective clothing except for the following items: white shirt and pants, hair net, hard hat, earplugs, and boots (whether personally provided or company provided).

As of October 2009, there were eight to ten time clocks at the Storm Lake facility, most of which were located at the entrances to production areas. One time clock was located in the hallway by the wash area leading into the cut floor. Although the time clocks record the time that hourly workers punch the clock to the minute, Tyson uses the clocks only for recording attendance, unless an employee arrives after the start of "gang time" for their line. In that case, time clocks are also used for compensation purposes. Otherwise, Tyson does not pay its hourly production employees based on the punch-in/punch-out times, but rather pays them on "gang time" plus the additional minutes as described above.

The typical hourly production employee at the Storm Lake facility is not exposed to toxic or caustic substances during the workday. Employees in the kill area are working with recently slaughtered hogs, while employees in the cut and retrim areas are working with chilled pieces of meat, much like a butcher would. Hourly production workers typically are not exposed to disease-causing agents during the workday.

The frock worn by production employees at defendant's Goodlettsville, Tennessee case-ready facility for the past several years is different from the frock worn by cut and retrim employees at the Storm Lake facility; the Goodlettsville frock has elasticized wrist bands, while the frock used at the Storm Lake facility does not. The frock worn by cut and retrim employees at the Storm Lake facility resembles a lab coat, with wide openings at the wrist. The white shirt and pants worn by kill floor employees is a fabric uniform like the uniform worn by many professions.

The only sanitary and protective clothing items required to be worn by all employees on the kill floor are a white shirt and pants, hairnet, hard hat, earplugs, and appropriate boots. The only sanitary and protective clothing items required to be worn by all employees on the cut and retrim floors are a frock, hairnet, hard hat, and earplugs. Rubber gloves are not required for all employees.

The standard sanitary and protective clothing items worn by production employees at the Storm Lake facility, such as the frock, white shirt and pants, hairnet and beard net, safety glasses, earplugs, hard hat, and boots, have remained basically the same during the past 25 years. Hourly production employees may wear their hard hat and rubber or steel-toed boots, if they wear them, to and from the plant each workday. Items such as a plastic apron, plastic sleeves, polar sleeves, cotton gloves, rubber or steel-toed boots, safety glasses, rain coat and pants are optional for at least some hourly production employees. Cotton gloves are provided to and used by employees for their comfort. Rubber gloves help employees keep their hands clean and warm. Some employees choose to wear a rubber apron to avoid getting wet or for appearance purposes.

Plaintiffs' expert, Dr. Kenneth Mericle, performed a time-study at the Storm Lake plant on April 23-24, 2009, and noted that different employees wear different combinations of clothing, both within the same area of the plant and when contrasting the different areas. Tyson, not OSHA, sets the rules at the Storm Lake facility regarding which safety items

are required for each position pursuant to general OSHA guidelines.

Thirteen plaintiffs have testified that wearing sanitary and protective clothing and equipment benefits them, including by keeping them clean and safe. Plaintiffs' expert agreed that employees have different routines for pre-shift and post-shift donning and doffing. Some employees clock in before they go to the locker room and begin donning pre-shift, while others clock in after they have performed some donning and left the locker rooms. Employees differ in the first item donned and order of items donned. For example, some may don their boots first while others may don a hairnet first. Others don their frock before their hairnet. Some employees spend time in the cafeteria after clocking in pre-shift. Some employees spend time in the cafeteria waiting, or drinking coffee after donning some items pre-shift, but before clocking in. Some employees don some items - such as earplugs, apron, rubber gloves, and cotton gloves - in locations other than the locker room, including in the restroom or on the production floor.

Plaintiffs' expert admitted that the class members' donning and doffing activities occurred in various areas throughout the plant. Some employees would don a particular item in the locker room, while other employees would don the same item in their production department. Some employees don items such as the frock and an apron in the cafeteria. Plaintiffs' expert observed that employees don and doff while walking in the hallways.

An employee's pre-shift routine may vary day to day. Some days they may stop to talk to co-workers in the locker room, while other days they may not. Plaintiffs' expert observed that employees socialize in between their donning and doffing activities, and his time-study calculations include that socializing time. One of the plaintiffs testified that the time spent donning pre-shift by an individual employee may differ from day to day.

Employees do their activities at substantially different times of the day, even for the same area and shift. For example, Plaintiffs' expert, Dr. Mericle, recorded one retrim

employee on April 23, 2009, who started donning pre-shift at their locker at 5:42 a.m. He recorded another retrim employee who did not start donning pre-shift at locker that day until 6:14 a.m., 31 minutes later. On the kill floor, Dr. Mericle recorded one employee start donning pre-shift at locker that day at 6:52 a.m. He recorded another kill floor employee who did not start donning pre-shift at their locker that day until 7:27 a.m., 35 minutes later. However, the next day, April 24, 2009, Dr. Mericle recorded a different range of starting times for the same activities. For example, the earliest that he recorded a retrim employee don pre-shift at locker the second day was 5:38 a.m., four minutes earlier than the prior day. And the latest that he recorded a retrim employee don pre-shift at their locker that second day was 5:49 a.m., only 11 minutes later than the first employee (compared to a spread of 31 minutes the previous day).

Plaintiffs' expert observed that employees changed clothes at different speeds. Some of the difference is attributable to differences in the number of items they donned and doffed, while some of it is attributable to employees' physical capabilities or choices.

Some employees clock out post-shift before going to the locker room, while employees who keep their ID badge in their coat or purse in their locker may clock out after going to the locker room at the end of their shift. An employee may choose to clock out post-shift before going to the locker room on some days, but not others. An employee may use different time clocks to clock out on different days. An employee may stop to talk to co-workers post-shift before clocking out.

Plaintiffs' expert confirmed that some employees are capable of doing the donning and doffing activities at issue in mere seconds. For example, Plaintiffs Balderas, Ernst, and Henly confirmed that they can don various items such as boots, frock, earplugs, rubber gloves, cotton (nylon) gloves, safety glasses, and plastic apron in seconds. Plaintiff Henley confirmed that doffing and disposing of items such as the frock and rubber gloves takes seconds. Plaintiff Banda testified that the time spent donning pre-shift differs from

employee to employee.

Plaintiffs' expert likewise concluded that there is substantial variation in the time that employees spend donning and doffing. His report contains 744 measurements, virtually all of which reflect different amounts of time. Employees even take substantially different amounts of time doing the same activities. For example, at Table 1 of Dr. Mericle's expert report (sequences 6 and 7), he measured two different kill floor employees doing essentially the same activity as he defined it (donning equipment pre-shift at their locker). One of them took over four-and-a-half minutes to do it, and the other took approximately one-half minute to do it.

In 1988 the United States Department of Labor filed a civil complaint in the United States District Court of the District of Kansas seeking back pay for employees at IBP Inc.'s non-union facilities, including the Storm Lake facility, for the time spent on the types of pre-and post-shift activities at issue in this litigation. On April 13, 1998, IBP began paying most employees at its non-union facilities, including all knife users as well as other employees in any department that contained a knife-user, an additional four minutes per day for the activities to be held to be compensable by the District Court in Kansas. Since these events, the Department of Labor has not initiated any further investigation or litigation against IBP (now Tyson) concerning how the company compensates hourly production employees in its beef and pork processing facilities, or communicated directly with the company in any way suggesting that these facilities are not in compliance with the Fair Labor Standards Act with respect to how hourly production employees are paid. Since Tyson Foods acquired IBP in 2001, the merged company has been continuously represented by its legal department and outside counsel on this issue and has received advice from them regarding the compensability of these activities.

On February 4, 2007, defendant added to its calculation of the reasonable pre and post-shift walking time at the Storm Lake facility to the amount of time employees in

various job positions were determined in the 1998 time studies to spend performing the various pre and post-shift activities previously found to be compensable. Unlike the four minute K code that has been paid since 1998, the new K code was paid only to knife-wielding employees. This resulted in hourly production employees at the Storm Lake facility receiving additional paid time ranging from zero to eight minutes per shift (and knife-users receiving four to eight minutes) depending on their position.

Prior to June 28, 2010, hourly production workers at the Storm Lake facility were given two breaks during a typical eight hour shift. The first break was a paid 15 minute break, and the second was an entirely unpaid 30 minute break. As of June 28, 2010, all hourly production employees have received at least 20 paid minutes each shift for activities they perform outside of production time, both before and after each shift and during breaks, including but not limited to any time spent taking off, putting back on, or washing certain protective clothing and equipment and walking to and from the production line. This extra 20 minutes of paid time provides all hourly production employees five minutes of paid time for certain pre-shift activities, five minutes of paid time for certain post-shift activities, and five minutes of paid time for certain activities performed during the first two breaks during a shift. In other words, the 15 minute break was lengthened to 25 minutes, with 20 minutes of the break being unpaid and five minutes being paid time. The 30 minute break was also lengthened to 35 minutes, with 30 minutes of the break being unpaid time and five minutes being paid time. In addition to the extra 20 minutes of paid time, most hourly production employees also receive additional minutes of paid time for donning and doffing-related activities. This additional paid time ranges up to three minutes per shift. The number of additional minutes assigned is particular to each job code, depending on the protective clothing required for that position.

### III.  DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant argues that plaintiffs' claim seeking unpaid wages for donning, doffing and washing activities performed during the meal period should be dismissed, following the reasoning by the United States Court of Appeals for the Fourth Circuit in <u>Sepulveda v. Allen Family Foods, Inc.</u>, 591 F.3d 209 (4th Cir. 2009).  According to the defendant, plaintiffs are not entitled to compensation for any part of the 30 minute meal period because it is a bona fide meal period, wherein the plaintiffs' time is not spent predominantly for the benefit of the employer.  In other words, the defendant argues that, because the 30 minute meal period as a whole was predominantly for the benefit of the employees, the entire 30 minutes was non-compensable, despite the fact that the plaintiffs spent a few minutes during that 30 minute period performing donning and doffing activities.  Alternatively, the defendant argues that plaintiffs' donning, doffing and washing activities during the meal period is non-compensable because it is de minimus.

Plaintiffs resist defendant's motion for partial summary judgment, arguing that the "continuous workday" rule, as reaffirmed by the United State Supreme Court in <u>Alvarez v. IBP, Inc.</u>, 546 U.S. 21 (2005), requires employers to pay an employee for all integral and indispensable activities that occur between the first and last principal activities of the employee's workday, including the donning and doffing of required sanitary and safety equipment performed during the unpaid meal period.  Plaintiffs argue further that the de minimus rule does not apply in this case as the activities at issue are regular, recurring events that the employees perform each and every day.

Plaintiffs receive a 30 minute unpaid meal period every day.  During this 30 minute meal period, no hogs are placed on the production line, and plaintiffs who work on the line are free to leave the production area when they finish working on the last piece of product that passes their workstations.  Plaintiffs have testified that during the 30 minute unpaid meal period, they must take off certain items of clothing and PPE before leaving the

production floor and put those items back on when they return. Plaintiffs' expert opined that meal period doffing and donning activities for which plaintiffs seek compensation take an average of 3.18 minutes in the "Fab" side of the plant and 3.36 minutes in the "Kill" side of the plant. The calculation includes time by some plaintiffs for washing clothing and equipment during the meal period. Plaintiffs stipulate that the remainder of the meal period (i.e., other than the donning, doffing, and washing activities performed by plaintiffs during the meal period) is predominately for their benefit.

At issue in Sepulveda was whether the activity of donning and doffing PPE constituted "changing clothes" within the meaning of 29 U.S.C. § 203(o). Sepulveda, 591 F.3d at 211. Noting that, under the FLSA, employers and unions may agree through collective bargaining to exclude "any time spent in changing clothes . . . at the beginning or end of each workday" from the compensable work time, the court in Sepulveda found that donning and doffing PPE does constitute "changing clothes" and therefore, the parties may agree through collective bargaining to exclude such time. Id. at 211. In footnote 4 in the Sepulveda decision, the court addresses the plaintiffs' claim for compensation, stating:

> Lastly, the employees seek compensation for the time they spend during their lunch breaks donning and doffing a few items, washing, and walking to and from the cafeteria. This time is non-compensable, however, because it is part of a bona fide meal period, *see* 29 C.F.R. § 785.19 ("Bona fide meal periods are not worktime."), and, in the alternative, *de minimus. See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) ("When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded.").

Id. at 211, n.4. It is upon this footnote that defendant bases its motion.

In 1961, a regulation issued by the Wage and Hour Division of the Department of

Labor ("DOL") defined a bona fide meal period as follows:

> Bona fide meal periods are not worktime. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

29 C.F.R. § 785.19.

Rejecting the "completely relieved" standard set forth in the DOL's definition of a bona fide meal period, the United States Court of Appeals for the Eighth Circuit has concluded that the "predominantly-for-the-benefit-of-the-employer standard provides the appropriate test for determining the compensability of meal periods under the FLSA." Hensen v. Pulaski County Sheriff Dept., 6 F.3d 531, 534 (8th Cir. 1993).

> We conclude that the Wage and Hour Division's meal period compensability standard lacks persuasive force. The regulation is inconsistent with the Supreme Court's longstanding interpretation of the Act and would mandate the application of a rigid rule in the face of the Supreme Court's direction that courts take a practical approach based on the unique facts of each case. Moreover, we note that the Wage and Hour Division has not consistently followed the policy that employers must compensate employees from meal times if they are not completely relieved from duty.

Id. at 535 (citations omitted).

As the court interprets the plaintiffs' claim, they are not disputing that they do, in fact, receive a bona fide meal period. Instead, at contention is the length of the meal period, i.e., plaintiffs claim they lose a little over three minutes of every 30 minute unpaid meal period to doffing and donning PPE, which is compensable work.

The Supreme Court in Steiner v. Mitchell, 350 U.S. 247, 256 (1956) found that

activities, such as the donning and doffing of specialized protective gear, that are

> performed either before or after the regular work shift, on or
> off the production line, are compensable under the portal-to-
> portal provisions of the Fair Labor Standards Act if those
> activities are an integral and dispensable part of the principal
> activities for which covered workmen are employed and are
> not specifically excluded by Section 4(a)(1).

This court fails to see how this logic would not extend to the donning and doffing activities performed by plaintiffs when their 30 minute unpaid meal period starts. Unlike the plaintiffs in <u>Henson</u>, whose break began only when the officers reached their break destination and were entitled to return to the station and change into civilian clothes on the department's time, the plaintiffs in the instant case have produced evidence that they lose over three minutes of every 30 minute unpaid meal period to doffing and donning activities. Moreover, the Fourth Circuit recently re-addressed the mid-shift donning and doffing issue in <u>Perez v. Mountaire Farms, Inc.</u>, expressing doubt whether the decision in <u>Sepulveda</u> was consistent with prior circuit precedent.

> We next address the issue whether the employees' acts of
> donning and doffing at their meal break are compensable as
> "work" under the FLSA. As an initial matter, we disagree
> with Mountaire's argument that our holding in *Roy v. County
> of Lexington*, 141 F.3d 533 (4th Cir. 1998), requires us to
> focus our analysis on the unpaid meal break as a whole, rather
> than on the time the employees spend donning and doffing
> their protective gear. Our decision in *Roy* does not counsel
> such a result.

> In *Roy,* certain emergency medical service personnel requested
> compensation for their entire meal break, because they were
> required to be "on call" to respond to emergencies during the
> entire break. 141 F.3d at 544. In conducting an analysis of
> the entire meal break, this Court denied the claim for
> compensation, concluding that the meal period, as a whole,
> predominately benefitted the employees. *Id.* at 545.

In the present case, however, the employees do not seek compensation for their entire meal break. Rather, the employees seek compensation only for the time periods in which the acts of donning and doffing occur, activities that they allege occur before and after their "bona fide meal period." Therefore, we are not confronted here with an issue whether the entire meal period predominately benefits the employer, but instead whether the time periods during which these activities occur, and for which compensation is sought, predominately benefit the employer. *See id.*

The district court found that the employees' acts of donning and doffing at the meal break benefit Mountaire by helping to "limit [Mountainaire's] products' exposure to bacteria and ensure that products are uncontaminated and clean." *Perez*, 610 F. Supp.2d at 521. Although the district court acknowledged that the employees also benefit from being able to eat "without blood and other chicken product on their persons," the district court found that the benefit to Mountaire outweighs the benefit to the employees. *Id.*

These factual findings are well-supported by the present record and, therefore, should be applied in the resolution of this appeal. *See Universal Furniture*, 618 F.3d at 427. If we were writing on a clean slate, we would hold that based on the district court's factual findings, these activities are not part of the "bona fide meal period" but are compensable as "work" under the continuous workday rule. *See Alvarez*, 546 U.S. at 29; *Roy*, 141 F.3d at 545.

We are bound, however, by circuit precedent. In *Sepulveda*, this court held, as a matter of law, that acts of donning and doffing occurring before and after employees eat their meals are non-compensable because these acts are part of the "bona fide meal period." 591 F.3d at 216. Alternatively, this Court concluded that the time spent by employees conducting such activities was non-compensable on the ground that the time

was de minimus.

. . .

In resolving this issue as a matter of law, the Court in *Sepulveda* appears to have departed from our holding in *Roy*, which instructs that the issue whether employees are entitled to receive compensation as a result of particular activities performed incident to a meal break presents "a question of fact to be resolved by appropriate findings of the trial court." *Roy*, 141 F.3d at 545 (quoting *Skidmore v. Swift*, 323 U.S. 134, 136-37, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). In *Skidmore*, the Supreme Court specifically advised against "lay[ing] down a legal formula to resolve [FLSA] cases so varied in their facts." 323 U.S. at 136. Thus, we conclude that the decision in *Roy* requires the "predominant benefit" factual analysis that the district court conducted in the present case.

Nevertheless, because the activities in *Sepulveda* involved meal break donning and doffing at a poultry processing plant, and the character of those activities cannot be distinguished substantively from the activities at issue here, we are required to follow this Court's holding resolving the issue. *See United States v. Prince-Oyibo*, 320 F.3d at 494, 501 (4th Cir. 2003). Accordingly, we conclude that the employees are not entitled to compensation for the time spent donning and doffing protective gear incident to the meal period. *Sepulveda*, 591 F.3d at 216.

2011 WL 2207110 *10-11 (June 7, 2011), *reh'g denied,* July 5, 2011.

Defendant's motion for summary judgment on this issue is denied.

The court further declines to find, as a matter of law, that the activities involved were de minimus and, therefore, not compensable. While "[i]t is true that some periods of time beyond normal working hours may be disregarded if it cannot, as a practical administrative manner, be precisely recorded for payroll purposes," the cases addressing

the de minimus issue "uniformly observe that the 'rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration and where failure to count such time is due to considerations justified by industrial realities.'" Saunders v. John Morrell & Co., 1992 WL 531674 *1 (N.D. Iowa 1992) (quoting 29 C.F.R. § 785.47). In determining whether otherwise compensable time is de minimus, the courts should consider (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of additional time; and (3) the regularity of the additional work. Lindow v. United States, 738 F.2d 1057, 1064 (9th Cir. 1984).

The defendant argues that the plaintiffs have failed to identify any facts to support their argument that the time at issue is administratively feasible to track. For purposes of summary judgment, however, the court finds that there is a genuine issue of material fact regarding the feasibility of tracking the time. This problem may easily be solved by strategically placing time clocks near break rooms and/or locker rooms and actually using them to record the time the plaintiffs work. The court's review of the record does not reveal evidence suggesting such an approach is administrative infeasible. With respect to the second factor, whether the aggregate amount of potentially compensable work is significant, i.e., several hundred employees per day at three-plus minutes per employee, presents a fact question. Finally, the alleged additional work at issue occurs every day. Granted, it may involve different combinations of PPE for various employees, but that does not make the potential additional work any less regular. A genuine issue of material fact exists whether plaintiffs' doffing and donning of PPE before and after unpaid meal periods constitutes compensable work and/or is de minimus. Defendant's motion for partial summary judgment on this issue is denied.

# IV. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs seek partial summary judgment on several of defendant's asserted defenses. First, plaintiffs move for summary judgment on defendant's defense that some of the activities for which plaintiffs seek compensation are not compensable because the donning or doffing of "standard" or non-unique safety equipment is not compensable. Second, plaintiffs seek summary judgment on defendant's "de minimis" defense. Finally, plaintiffs move for summary judgment on defendant's Portal-to-Portal Act defense under 29 U.S.C. § 254. Defendant had also claimed defenses of good faith pursuant to both 29 U.S.C. § 259 and § 260, and opposed the application of the three-year limitations period, but has since withdrawn such defenses. The court will address each defense separately.

## A. Donning/Doffing of Standard or "Non-Unique" Equipment

Plaintiffs argue that defendant should not, as a matter of law, be allowed to assert the defense that the donning and doffing of standard or "non-unique" PPE is not compensable. Plaintiffs argue that such activities are "integral" and "indispensable" to the principal activity of meat processing and take place during the continuous workday. Plaintiffs claim that, pursuant to the Supreme Court's decision in Alvarez, coupled with the DOL's 2006 Advisory Memorandum, there is no longer a viable legal distinction between "unique" and "non-unique" equipment in terms of determining the compensability of donning and doffing such equipment. Rather, plaintiffs claim, it is undisputed that they must obtain and don all of their PPE on the plant's premises and doff and leave such equipment at the plant on a daily basis, making it integral and indispensable, and therefore compensable.

The defendant resists, arguing that there is a genuine issue of material fact as to whether the donning and doffing of non-unique items and sanitary outer garments are compensable, either because they are not "work" or because they are not principal

18

activities. With respect to the required items at issue, defendants argue that a fact issue exists as to whether the items are necessary or essential to perform meat-processing work, or whether defendant or the plaintiffs receive the primary benefit from wearing any of the items.

In reply the plaintiffs contend that the non-unique equipment at issue is all required by defendant, thus making it integral and indispensable to meat processing workers' principal work activities.

This issue was also addressed by the Fourth Circuit in Perez:

> Under the Ninth Circuit's definition in *Alvarez*, the donning and doffing of protective gear at the beginning and the end of a work shift are acts "integral and indispensable" to the employer's principal activity when the donning and doffing are: 1) necessary to the principal work performed; and 2) primarily benefit the employer. *See Alvarez*, 339 F.3d at 902-03. An act is necessary to a principal activity if that act is required by law, by company policy, or by the nature of the work performed. *Id.* at 903 (citing 29 C.F.R. § 790.9(c) n. 65). Other circuit courts have used a similar definition of integral and indispensable." *See Franklin*, 619 F.3d at 620; *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007).
>
> Because we agree that the two-part definition employed by the Ninth Circuit in *Alvarez* provides a consistent construction for application of the *Steiner* test, we apply that two-part definition to determine whether the employees' acts of donning and doffing at the beginning and the end of work shifts are "integral and indispensable" to Mountaire's principal activities. In adopting this definition from *Alvarez*, we reject Mountaire's contention that this definition effectively will undermine application of the Portal-to-Portal Act. The requirements of this definition, that an act be necessary to the principal work and primarily benefit the employer, ensure that an employee will only be compensated for such acts that are essential to the principal activity, rather than those that merely

precede or follow in a temporal sense the performance of that principal activity. Therefore, we now turn to consider the acts of donning and doffing in the present case, which occur at the beginning and the end of the employee's work shifts.

As an initial matter, and contrary to Mountaire's suggestion, we decline to distinguish the employees' protective gear as either "specialized" or "generic." This distinction was not made in *Steiner*. The work clothes at issue in *Steiner* were simply described as "old but clean work clothes," and the Supreme Court did not characterize the clothes as "special." *See Steiner*, 350 U.S. at 251. Thus, we hold that these terms are not relevant to our "integral and indispensable" analysis, and we do not classify the employees' protective gear in this manner.

Perez v. Mountaire Farms, Inc., 2011 WL 2207110 *7 (June 7, 2011).

This court finds the above reasoning to be sound. However, as the court understands defendant's position, it wishes to argue that items such as work boots, hairnets, and hard hats are not "integral" and "indispensable" to the principal activity of meat processing. The court agrees with the defendant that a fact issue exists on this issue, i.e., are such items "integral and dispensable" to perform meat-processing work? This court's research on this question reveals that the answer is far from uniform. Plaintiffs' motion for summary judgment is denied.


## B. De Minimis

As noted by the Supreme Court, "[s]plit-second absurdities are not justified by the actualities of working conditions or by the policy of the [FLSA]. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." Anderson v. Mt. Clemons Pottery, 328 U.S. 680, 692 (1946). Therefore, even if a plaintiff's donning and doffing activities constitute

work as indispensable to their principal activities, those activities may nonetheless be excluded from FLSA coverage if the time spent on them is de minimus. As set forth above, determining whether the time spent on an activity is de minimus requires a consideration of the following factors: (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of additional time; and (3) the regularity of the additional work. Lindow, 738 F.2d at 1062-63 (9th Cir. 1984).

Ultimately, the precise amount of time that can be considered de minimus is a question for the trier of fact and there exists a genuine issue of material fact as to the administrative difficulty involved in recording the time at issue, as well as the aggregate amount of additional time. Summary judgment on this issue is inappropriate. Plaintiffs' motion for summary judgment on this issue is denied.


### C. Portal-to-Portal Act

Plaintiffs move for summary judgment on defendant's Portal-to-Portal Act defense, arguing that the Supreme Court has already ruled in Alvarez that donning and doffing of required PPE is integral and indispensable to the principal activity of meat processing and is therefore itself a principal activity. Plaintiffs claim that it is undisputed that Tyson production workers at Storm Lake must obtain and don all of their PPE on site at the plant prior to entering the production floor and performing any meat processing activities. Accordingly, plaintiffs contend, the donning and doffing of PPE is a "principal activity" in a pork processing job and, therefore, time spent on these activities is compensable pursuant to the FLSA.

The Portal-to-Portal Act of 1947 amended the Fair Labor Standards Act ("FLSA") to exclude the following activities from "working" time:

> (1) walking, riding, or traveling to and from the actual place
> of performance of the principal activity or activities which
> such employee is employed to perform, and

21

> (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur prior to the time or any particular workday at which such employee commences, or subsequent to the time any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).

Preliminary and postliminary activities are compensable, however, if they are an "integral and indispensable part of the [employee's] principal activities." Steiner v. Mitchell , 350 U.S. 247, 256 (1956). For purposes of the Portal-to-Portal Act, an "integral and indispensable" activity is itself a principal activity. IBP, Inc. v. Alvarez, 546 U.S. 21, 37 (2005).

The court finds that a genuine issue of material fact exists as to whether donning and doffing the PPE at issue in this case is "integral and indispensable" to the principal work of pork processing, especially if doing do is required by the defendant's internal rules as well as applicable law. Likewise, it is a jury question as to whether the donning and doffing of the PPE is done "necessary and primarily" for the benefit of the defendant. The court finds somewhat specious defendant's contention that the donning and doffing of the PPE primarily benefits the plaintiffs by keeping their clothes clean. Such argument completely ignores the benefit to defendant. As two other district courts considering this issue have noted:

> The fact is that frocks enable the defendants to maintain the cleanliness of their facilities and prevent their product from becoming contaminated. This benefit is enormous when one considers the damage that would result to the defendants if they were to sell a contaminated food product. This minor benefit to the employees of keeping their clothes clean pales by comparison. As such, there is no question that, as a matter of

law, it is the defendants who reap not only *some* benefit from the donning and doffing of the frocks, but the *primary* benefit of doing so.

Jordan et al. v. IBP, Inc., 542 F. Supp.2d 790, 807 (M.D. Tenn. 2008).

Defendants are likewise benefitted by the employees' donning and doffing PPE. First, defendants are able to meet the sanitary and safety requirements of federal law. These requirements include USDA animal products safe handling regulations and OSHA workplace safety regulations. Second, defendants are able to process, manufacture, and sell sanitary and uncontaminated chicken. Finally, Defendants mitigate their liability regarding workplace hazards. These benefits are important, especially in the context of public safety and defendants' potential exposure to civil liability (both as commercial manufacturers and as employers). If defendants do not require employees to wear PPE while they processed chicken on the production line, then they face substantial fines and penalties for violating federal law. In fact, defendants "could not continue to operate its chicken-processing business if it failed to maintain a certain level of cleanliness in compliance with USDA regulations, or if it failed to follow OSHA regulations relating to employee safety." Fox v. Tyson Foods, Inc., 2002 WL 32987224 *9 (N.D. Ala.). In recent months, many manufacturers and sellers of meat products have recalled their products due to possible salmonella, listeria or E. coli contamination, costing manufacturers and sellers millions of dollars. Further, the cost of defending and satisfying a judgment in a civil case for placing contaminated meat products in commerce is potentially financially devastating to a manufacturer or seller. *See generally* Jean C. Buzby, Paul D. Frenzen, and Barbara Rasco, *Product Liability and Microbial Foodborne Illness*, Agricultural Economic Report No. AER799, 13-23 (April 2001).

Perez v. Mountaire Farms, Inc., 601 F. Supp.2d 670, 680-81 (D. Md. 2009). On appeal, the United States Court of Appeals for the Fourth Circuit affirmed this finding:

> Mountaire does not dispute the district court's finding that the employees are required as a matter of federal law to wear certain protective gear on the "production line. These legal requirements are based on regulations concerning sanitation promulgated by the United States Department of Agriculture, and on safety regulations established by OSHA. *See* 29 C.F.R. § 1910.132(a); 9 C.F.R. § 416.5.

Perez, 2011 WL 2207110 at *8.

The Fourth Circuit then discussed the fact that company policy and/or federal law required employees to wear hard hats ("bump caps"), hair and beard nets, specific types of ear plugs, clean smocks and aprons, and sanitize their PPE. Id. The Fourth Circuit concluded that these activities were necessary to chicken processing, but noted that it must also consider whether the record supported a conclusion that the donning and doffing primarily benefitted Mountaire. Id. On this issue the Fourth Circuit concluded that the employees' acts of donning and doffing at the beginning and end of their work shifts primarily benefit Mountaire and, therefore, are "integral and indispensable" to chicken processing. Id. at *8-9.

Plaintiffs' motion for summary judgment on this issue is denied.


## V.  CONCLUSION

As set forth above, defendant's motion for partial summary judgment [dkt. 123] is **DENIED**.  Plaintiffs' motion for partial summary judgment [dkt. 124] is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 4th day of August, 2011.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA